# SMYTH v. AMES.

# SMYTH v. SMITH.

# SMYTH v. HIGGINSON.

## APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEBRASKA.

Nos. 49, 50, 51. Argued April 5, 6, 7, 1897. — Decided March 7, 1898.

The adequacy or inadequacy of a remedy at law for the protection of the rights of one entitled upon any ground to invoke the powers of a Federal court, is not to be conclusively determined by the statutes of the particular State in which suit may be brought. One who is entitled to sue in the Federal Circuit Court may invoke its jurisdiction in equity whenever the established principles and rules of equity permit such a suit in that court; and he cannot be deprived of that right by reason of his being allowed to sue at law in a state court on the same cause of action.

A suit against individuals for the purpose of preventing them as officers of a State from enforcing an unconstitutional enactment to the injury of the rights of the plaintiff, is not a suit against the State within the meaning of the Eleventh Amendment.

Until Congress, in the exercise either of the power specifically reserved by the eighteenth section of the act of July 1, 1862, incorporating the Union Pacific Railroad Company, or its power under the general reservation made of authority to add to, alter, amend or repeal that act, prescribes rates to be charged by that company, it remains with the States through which the road passes to fix rates for transportation beginning and ending within their respective limits.

It is settled that —

(1) A railroad corporation is a person within the meaning of the Fourteenth Amendment declaring that no State shall deprive any person of property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

(2) A state enactment, or regulations made under the authority of a state enactment, establishing rates for the transportation of persons or property by railroad that will not admit of the carrier earning such compensation as under all the circumstances is just to it and to the public, would deprive such carrier of its property without due process of law, and deny to it the equal protection of the laws, and would therefore be repugnant to the Fourteenth Amendment to the Constitution of the United States.

(3) While rates for the transportation of persons and property within the limits of a State are primarily for its determination, the question whether they are so unreasonably low as to deprive the carrier of its property without such compensation as the Constitution secures, and, therefore, without due process of law, cannot be. so conclusively determined by the legislature of the State or by regulations adopted under its authority, that the matter may not become the subject of judicial inquiry.

The grant to the legislature in the constitution of Nebraska of the power to establish maximum rates for the transportation of passengers and freight on railroads in that State has reference to "reasonable" maximum rates, as the words strongly imply that it was not intended to give a power to fix maximum rates without regard to their reasonableness; and as it cannot be admitted that the power granted may be exerted in derogation of rights secured by the Constitution of the United States, and that the judiciary may not, when its jurisdiction is properly invoked, protect those rights.

The idea that any legislature, state or Federal, can conclusively determine for the people and for the courts that what it enacts in the form of law, or what it authorizes its agents to do, is consistent with the fundamental law, is in opposition to the theory of our institutions; as the duty rests upon all courts, Federal and state, when their jurisdiction is properly invoked, to see to it that no right secured by the supreme law of the land is impaired or destroyed by legislation.

The reasonableness or unreasonableness of rates prescribed by a State for the transportation of persons and property wholly within its limits must be determined without reference to the interstate business done by the carrier, or to the profits derived from that business. The State cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the State has no control; nor can the carrier justify unreasonably high rates on domestic business upon the ground that it will be able only in that way to meet losses on its interstate business.

A railroad.is a public highway, and none the less so because constructed and maintained through the agency of a corporation deriving its existence and powers from the State. Such a corporation was created for public purposes. It performs a function of the State. Its authority to exercise the right of eminent domain and to charge tolls was given primarily for the benefit of the public. It is, therefore, under governmental control — subject, of course, to the constitutional guarantees for the protection of its property. It may not fix its rates with a view solely to its own interests, and ignore the rights of the public; but the rights of the public would be ignored if rates for the transportation of persons or property on a railroad were exacted without reference to the fair-value of the property used for the public or of the services rendered, and in order simply that the corporation may meet operating

expenses, pay the interest on its obligations, and declare a dividend to stockholders.

If a railroad corporation has bonded its property for an amount that exceeds its fair value, or if its capitalization is largely fictitious, it may not impose upon the public the burden of such increased rates as may be required for the purpose of realizing profits upon such excessive valuation or fictitious capitalization; and the apparent value of the property and franchises used by the corporation, as represented by its stocks, bonds and obligations, is not alone to be considered when determining the rates that may be reasonably charged.

A corporation maintaining a public highway, although it owns the property it employs for accomplishing public objects, must be held to have accepted its rights, privileges and franchises subject to the condition that the government creating it, or the government within whose limits it conducts its business, may by legislation protect the people against the exaction of unreasonable charges for the services rendered by it: but it is equally true that the corporation performing such public services, and the people financially interested in its business and affairs, have rights that may not be invaded by legislative enactment in disregard of the fundamental guarantees for the protection of property.

The basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public; and in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience; and on the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth.

The effect of the Nebraska statute of 1893, entitled "An act to regulate railroads, to classify freights, to fix reasonable maximum rates to be charged for the transportation of freights upon each of the railroads in the State of Nebraska, and to provide penalties for the violation of this act," is to deprive each of the companies involved in these suits of the just compensation secured to them by the Constitution of the United States, and therefore the decree below restraining its enforcement was correct.

If the Circuit Court finds that the present condition of business is such as to admit of the application of the statute to the railroad companies in question without depriving them of just compensation, it will be its duty to discharge the injunction heretofore granted, and to make whatever

order is necessary to remove any obstruction placed by the decrees in these cases in the way of the enforcement of the statute.

THE appellees in the first of the above cases were the plaintiffs below, and are citizens of Massachusetts and stockholders of the Union Pacific Railway Company. They sued on behalf of themselves and all others similarly situated. The defendants are the Union Pacific Railway Company, the St. Joseph and Grand Island Railroad Company, the Omaha and Republican Valley Railroad Company and the Kansas City and Omaha Railroad Company — corporations of Nebraska under the control of the Union Pacific Railway Company; certain persons, citizens of Nebraska, who hold the offices, respectively, of Attorney General, Secretary of State, Auditor of Public Accounts, State Treasurer, and Commissioner of Public Lands and Buildings, and constitute the State Board of Transportation; and James C. Dahlman, Joseph W. Edgerton and Gilbert L. Laws, citizens of Nebraska and Secretaries of that Board. By a supplemental bill in the same suit, certain persons, receivers of the Union Pacific Railway Company, were made defendants.

In the second case, some of the plaintiffs, appellees here, are subjects of Queen Victoria, while the others are citizens of Massachusetts. They are all stockholders of the Chicago and Northwestern Railroad Company, a corporation organized and existing under the laws of Illinois, Wisconsin and Iowa, and have sued in that capacity on behalf of themselves and all others similarly situated. The defendants are the Chicago and Northwestern Railroad Company, the Fremont, Elkhorn and Missouri Valley Railroad Company, a Nebraska corporation, and the Chicago, St. Paul, Minneapolis and Omaha Railway Company, a corporation organized under the laws of Minnesota and Nebraska, both under the control of the Chicago and Northwestern Railroad Company; and the above officers constituting the State Board of Transportation, as well as those holding the positions of Secretaries of that Board.

In the third case, the appellees Henry L. Higginson and others, citizens of Massachusetts, were the plaintiffs below. They sued on behalf of themselves and all other stockholders

of the Chicago, Burlington and Quincy Railroad Company, a corporation organized and existing under the laws of Illinois and Iowa, and whose lines west of the Missouri River are known as the Burlington and Missouri Road. The defendants are the Chicago, Burlington and Quincy Railroad Company, the persons composing the Nebraska State Board of Transportation and the Secretaries of that Board.

For the sake of brevity, the Union Pacific Railway Company will be called the Union Pacific Company; the St. Joseph and Grand Island Railroad Company, the St. Joseph Company; the Omaha and Republican Valley Railroad Company, the Omaha Company; the Kansas City and Omaha Railroad Company, the Kansas City Company; the Fremont, Elkhorn and Missouri Valley Railroad Company, the Fremont Company; the Chicago, St. Paul, Minneapolis and Omaha Railway Company, the St. Paul Company; and the Chicago, Burlington and Quincy Railroad Company, the Burlington Company.

Each of these suits was brought July 28, 1893, and involves the constitutionality of an act of the legislature of Nebraska, approved by the Governor April 12, 1893, and which took effect August 1, 1893. It was an act "to regulate railroads, to classify freights, to fix reasonable maximum rates to be charged for the transportation of freights upon each of the railroads in the State of Nebraska, and to provide penalties for the violation of this act." Acts of Nebraska, 1893, c. 24; Compiled Statutes of Nebraska, 1893, c. 72, Art. 12. The act is referred to in the record as House Roll 33.

Prior to the enactment of that statute, the legislature passed an act to regulate railroads, prevent unjust discrimination, provide for a Board of Transportation, and define its duties, and repeal articles 5 and 8 of chapter 72, entitled "Railroads," of the Revised Statutes of Nebraska, and all acts and parts of acts in conflict therewith — the same being chapter 60 of the Session Laws of 1887, and now article 8 of chapter 72 of the Compiled Statutes of Nebraska of 1893. By that act the Attorney General, Secretary of State, Auditor of Public Accounts, State Treasurer and Commissioner of Public Lands

and Buildings were constituted a Board of Transportation, with power to appoint three secretaries to assist in the performance of its duties, and with authority to inquire into the management of the business of all common carriers subject to its provisions and obtain from them the full and complete information necessary to enable the Board to perform its duties and carry out the objects for which it was created. It was also provided that, for the purposes of the act, the Board should have power to require the attendance and testimony of witnesses and the production of all books, papers, contracts, agreements and documents relating to any matter under investigation, and to that end could invoke the aid of any of the District Courts or of the Supreme Court of the State; and that any court of competent jurisdiction in which such inquiry was carried on could, in case of contumacy or refusal to obey a subpœna issued to any common carrier or person subject to the provisions of the act, issue an order requiring such carrier or other person to appear before the Board, (and produce books and papers if ordered,) and give evidence touching the matter in question; and any failure to obey the order was punishable by the court as for contempt. The claim that any testimony or evidence might tend to criminate the person giving evidence would not excuse the witness from testifying, but such evidence or testimony could not be used against him on the trial of any criminal proceeding.

The power to enact the statute whose validity is now assailed, that is, the above statute of August 1, 1893, regulating railroads, classifying freights, fixing reasonable maximum rates, etc., in Nebraska, was referred by counsel to the general legislative power of the State as well as to the fourth section of Article XI of the state constitution which provides: "Railways heretofore constructed, or that may hereafter be constructed in this State, are hereby declared public highways, and shall be free to all persons for the transportation of their persons and property thereon, under such regulations as may be prescribed by law. And the legislature may from time to time pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on

the different railroads in this State.' The liability of railroad corporations as common carriers shall never be limited."

By the first section of that statute it is declared that, except as therein otherwise provided, its provisions shall apply to all railroad corporations, railroad companies and common carriers engaged in Nebraska in the transportation of freight by railroad therein, and also to shipments of property made from any point within the State to any other point within its limits. That section provides: "The term 'railroad,' as used in this act, shall include all bridges and ferries used or operated in connection with any railroad, and also all the road in use by any corporation, receiver, trustee or other person operating a railroad whether owned or operated under contract, agreement, lease or otherwise, and the term 'transportation' shall include all instrumentalities of shipment or carriage, and the term 'railroad corporation' contained in this act shall be deemed and taken to mean all corporations, companies or individuals, now owning or operating, or which may hereafter own or operate, any railroad, in whole or in part, in this State, and the provisions of this act, except as in this act otherwise provided, shall apply to all persons, firms and companies, and to all associations of persons, whether incorporated or otherwise, that shall do business as common carriers of freight upon any of the lines of railway in this State, the same as to railroad corporations herein mentioned." § 1.

The second section provides that all freight or property to be transported by any railroad company or companies mentioned in the first section, "from any point in the State of Nebraska to any other point in said State, shall be classified as hereinafter in this section provided, and any other or different classification of freight, which would raise the rates on class or commodity of freights above the rates prescribed in this act, except as hereinafter otherwise provided, is prohibited and declared to be unlawful. The classification established by this act shall be known as the 'Nebraska Classification.' Freights shall be billed at the actual weight unless otherwise directed in the classification — twenty thousand pounds shall

be a carload, and all excessive weights shall be at the same rate per hundred pounds, except in carloads of light and bulky articles, and unless otherwise specified in the classification. When the classification makes an article 'released.' or 'owner's risk,' the same at carrier's risk will be the next rate higher, unless otherwise provided in the classification. Articles, rated first class, 'released' or owner's risk, if taken at 'carrier's risk,' will be 1½ times first class, unless otherwise provided in the classification. All articles carried according to this classification at 'owner's risk' of fire, leakage, damage or breakage, must be so receipted for by agents of the railroad, and so considered by owners and shippers. Signing a release contract by a shipper shall not release the railroad company for loss or damages caused by carelessness or negligence of its employés." § 2.

Following this section, in the body of the statute, are tables of the classification of freights.

The third section is in these words: "That each of the railroads in the State of Nebraska shall charge for the transportation of freight from any point in said State, to any other point in said State, no higher or greater rate of charge than is by this act fixed as the reasonable maximum rate for the distance hauled, and the reasonable maximum rates for the transportation of freight by railroad from any point in the State of Nebraska to any other point in said State are declared and established to be as hereinafter in this section fixed for the distance named, and any higher or greater rate for the distance hauled than that herein fixed and established, is prohibited and declared to be unlawful; and the reasonable maximum rate herein fixed and established shall be known as the Nebraska Schedule of Reasonable Maximum Rates." § 3.

Here follow tables of the rates prescribed by the statute.

That the full scope of the act may appear, its remaining sections are given as follows :

"§ 4. All railroads or parts thereof which have been built in this State since the 1st day of January, 1889, or may be built before the 31st day of December, 1899, shall be exempt

from the provisions of this act until the 31st day of December, 1899.

"§ 5. Whenever any railroad company or companies in this State shall, in a proper action, show by competent testimony that the schedule of rates prescribed by the act are unjust and unreasonable, such railroad or railroads shall be exempt therefrom as hereinafter provided. All such actions shall be brought before the Supreme Court, in the name of the railroad company or companies bringing the same, and against the State of Nebraska, and upon the hearing thereof, if the court shall become satisfied that the rates herein prescribed are unjust in so far as they relate to the railroad bringing the action, [it] may issue their [its] order directing the Board of Transportation to permit such railroad to raise its rates to any sum in the discretion of the Board : *Provided*, That in no case shall the rates so raised be fixed at a higher sum than that charged by such railroad on the first day of January, 1893. Whenever any railroad company in this State shall claim the benefit of the provisions of this section, it shall be the duty of such railroad company to show to the court all matters pertaining to the management thereof, and if it shall appear that said railroad company is operating branch lines of railroad in connection with its main line, and all included in one system, then, and in that case, it shall be the duty of the railroad company to show to the court upon which branch or branches, or upon which portion of such system the schedule of rates prescribed in this act is unjust and unreasonable, and only such portions shall be exempted from the provisions thereof : *Provided*, That in no case shall a railroad company be allowed to pool the earnings of all the lines operated under one management, where more than one line is so operated, for the purpose of lowering the general average.

"§ 6. That the Board of Transportation is hereby empowered and directed to reduce the rates on any class or commodity in the schedule of rates fixed in this act, whenever it shall seem just and reasonable to a majority of said Board so to reduce any rate ; and said Board of Transportation is hereby empowered and directed to revise said classification of

freight as hereinbefore in this act established, whenever it shall appear to a majority of said Board just and reasonable to revise said classification. *Provided:* That said Board of Transportation shall never change the classification in the act established, so that by such change or classification the rates on any freight will become higher or greater than in this act fixed. When any reduction of rates or revision of classification shall be made by said Board, it shall be the duty of said Board to cause notice thereof to be published two successive weeks in some public newspaper, published in the city of Lincoln, in this State, which notice shall state the date of the taking effect of such change of rate or classification, and said change of rate or classification so made by the said Board and published in said notice, shall take effect at the time so stated in said notice.

"§ 7. That articles not enumerated in said classification in section two of this act established, not rated in said schedule of rates in section three of this act, shall be classed with analogous articles in said classification, and where there is any conflict between said classification and said schedule of maximum rates, said rates shall govern.

"§ 8. That in case any common carrier subject to the provisions of this act shall do, or cause to be done, or permit to be done, any act, matter or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter or thing in this act required to be done, such common carrier shall be liable to the person or persons injured thereby, for all damages sustained in consequence of any such violation of the provisions of this act together with cost of suit and a reasonable counsel or attorney's fee, to be fixed by the court in which the same is heard on appeal or otherwise, which shall be taxed and collected as part of the costs in the case: *Provided,* That in all cases demand in writing on said common carrier shall be made for the money damages sustained before suit is brought for recovery under this section, and that no suit shall be brought until the expiration of fifteen days after such demand.

"§ 9. That in case any common carrier subject to the pro-

visions of this act shall do, or cause to be done, or permit to be done, any act, matter or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter or thing in this act required to be done, such common carrier shall, upon conviction thereof, be fined in any sum not less than one thousand dollars, nor more than five thousand dollars for the first offence; and for the second offence not less than five thousand dollars, nor more than ten thousand dollars; and for the third offence, not less than ten thousand dollars, nor more than twenty thousand dollars; and for every subsequent offence and conviction thereof, shall be liable to a fine of twenty-five thousand dollars: *Provided*, That in all cases under this act either party shall have the right of trial by jury.

"§ 10. All acts and parts of acts inconsistent herewith are repealed."

These cases were heard at the same time, and in the one in which the Union Pacific Company, the St. Joseph Company, the Omaha Company and the Kansas City Company were defendants, it was adjudged in the Circuit Court — Mr. Justice Brewer presiding — as follows: "That the said railroad companies and each and every of them, and said receivers, be perpetually enjoined and restrained from making or publishing a schedule of rates to be charged by them or any or either of them for the transportation of freight on and over their respective roads in this State from one point to another therein, whereby such rate shall be reduced to those prescribed by the act of the legislature of this State, called in the bill filed therein, 'House Roll 33,' and entitled 'An act to regulate railroads, to classify freights, to fix reasonable maximum rates to be charged for the transportation of freight upon each of the railroads in the State of Nebraska, and to provide penalties for the violation of this act,' approved April 12, 1893, and below those now charged by said companies or either of them or their receivers, or in anywise obeying, observing or conforming to the provisions, commands, injunctions and prohibitions of said alleged act; and that the Board of Transportation of said State and the members and secretaries

of said Board be in like manner perpetually enjoined and restrained from entertaining, hearing or determining any complaint to it against said railroad companies or any or either of them or their receivers, for or on account of any act or thing by either of said companies or their receivers, their officers, agents, servants or employés, done, suffered or omitted, which may be forbidden or commanded by said alleged act, and from instituting or prosecuting or causing to be instituted or prosecuted any action or proceeding, civil or criminal, against either of said companies or their receivers for any act or thing done, suffered or omitted, which may be forbidden or commanded by said act, and particularly from reducing its present rates of charges for transportation of freight to those prescribed in said act, and that the Attorney General of this State be in like manner enjoined from bringing, aiding in bringing or causing to be brought, any proceeding by way of injunction, mandamus, civil action or indictment against said companies or either of them or their receivers for or on account of any action or omission on their part commanded or forbidden by the said act. And that a writ of injunction issue out of this court and under the seal thereof, directed to the said defendants, commanding, enjoining and restraining them as hereinbefore set forth, which injunction shall be perpetual save as is hereinafter provided. And it is further declared, adjudged and decreed that the act above entitled is repugnant to the Constitution of the United States, forasmuch as by the provisions of said act the said defendant railroad companies may not exact for the transportation of freight from one point to another within this State, charges which yield to the said companies, or either of them, reasonable compensation for such services. It is further ordered, adjudged and decreed that the defendants, members of the Board of Transportation of said State, may hereafter when the circumstances have changed so that the rates fixed in the said act shall yield to the said companies reasonable compensation for the services aforesaid, apply to this court by supplemental bill or otherwise, as they may be advised, for a further order in that behalf. It is further ordered, adjudged and

decreed that the plaintiffs recover of the said defendants their costs to be taxed by the clerk."

The above decree was in accordance with the prayer for relief. A similar decree was rendered in each of the other cases.

The present appeals were prosecuted by the defendants constituting the State Board of Transportation, as well as by the defendants who are Secretaries of that Board.

*Mr. John L. Webster* for appellants. *Mr. A. S. Churchill*, attorney general of the State of Nebraska, was on his brief.

Before taking up the question as to the validity of the act in question, we desire to call the attention of the court to some of the propositions stated by Mr. Justice Brewer in his opinion, filed herein; for we conceive that these propositions, thus stated, contributed largely to what we believe to be an erroneous conclusion.

In that opinion it is stated: "Property invested in railroads is as much protected from public appropriation as any other. If taken for public use, its value must be paid for. . . . He may have made his fortune dealing in slaves, or as a lobbyist, or in any other way obnoxious to the public; but, if he has acquired the legal title to the property, he is protected in its possession, and cannot be disturbed until the receipt of its actual cash value. The same rule controls if railroad property is sought to be appropriated. No inquiry is open as to whether the owner has received gifts from the State, or individuals, or whether he has, as owner, managed the property well or ill, or so as to acquire a large fortune therefrom. It is enough that he owns the property; has the legal title; and so owning, he must be paid the actual value of that property. . . . These propositions, in respect to condemnation proceedings, are so well settled that no one ever questions them."

We take no exception to this proposition. But it is equally well settled that, where such property is incumbered, that the incumbrance cuts no figure in ascertaining the cash value of

the property in such condemnation proceedings. The party holding such incumbrance would be entitled to the proceeds to the extent of such incumbrance: provided, it did not exceed the actual cash value so ascertained; but where it did, the property would be discharged of the lien, and the party holding such incumbrance would have to look to the personal liability of the obligor.

Again, it is said in the opinion of the court: "If it be said that the rates must be such as to secure to the owners a reasonable per cent on the money invested, it will be remembered that many things have happened to make the investment far in excess of the actual value of the property — injudicious contracts, poor engineering, unusually high cost of material, rascality on the part of those engaged in the construction or management of the property. These, and many other things, as is well known, are factors which have largely entered into the investment with which many railroad properties stand charged. Now, if the public was seeking to take title to the railroad by condemnation, the present value of the property, and not the cost, is that which it would have to pay." Then, indeed, would the loss arising from "injudicious contracts, poor engineering, unusually high cost of material" and the "rascality on the part of those engaged in the construction or management of the property" fall upon those who made the "injudicious contracts" or employed "poor engineering" to be done, or paid "unusually high cost for material," or engaged the rascals in the construction or management of the property. And why should they not? Did not the investor, in either the stock of the company, or in its bonds, take his chances in these respects, just the same as the investor in the stock of any other business corporation, or in the bonds or mortgages upon any other property? Why, may we not ask, should the public bear the burden imposed by "injudicious contracts," or "poor engineering," or the "unusually high price paid for material," or the "rascality on the part of those engaged in the construction or management of the property"? The public had nothing to do with any of these. The public did not invest upon such

chances. The public can justly be called upon to pay such reasonable rates as will yield a reasonable compensation for the use of the fair and reasonable value of the property, and not more. If investors put their money into the hands of those who thus manage the property, or in securities upon properties thus constructed, or managed, it was either their misfortune or their folly; but it affords no excuse for burdening the public with high rates, to the profit either of the rascals or of those who trusted in them.

His honor further added in the opinion: "Nevertheless, the amount of money that has gone into the railroad property as the actual investment, as expressed, theoretically at least, by the amount of stock and bonds, is not to be ignored, even though such sum is far in excess of the present value."

Is it possible that the patrons of a railroad, who had nothing to do with the injudicious contract, poor engineering, unusually high cost of material, rascality on the part of those engaged in the construction or management, must bear all the burden of these injudicious contracts, poor engineering and rascality in the construction or management, in order that the poor engineers and rascals or those who employed them may reap the benefit? If this be so, then, indeed, the time has actually come when the railroad lord can say to the public: "Ye know I reap where I had sown not, and that I gathered where I had not strewn."

Again, his honor tells us that: "The transportation of persons and property by private individuals and corporations has become a business and not a system."

Then he further says: "Now in the carrying on of any private enterprise, increase of business, with increase of profits, is a stimulating thought, and for this every variety of action is taken. Advancement, solicitation, inducement, favors are all freely resorted to, but with the single purpose of larger business and greater gain. It is not strange that in carrying on of transportation all the characteristics of other kinds of business are found."

There can be no doubt about the correctness of either of these propositions. We admit their truth, and insist that

there shall be applied to this business and to these inducements the same rules of law which are applied under similar circumstances to other business and to like inducements in the management of other business enterprises.

Without any statute regulating rates, a common carrier of persons or property, in the absence of a specific contract, is, at common law, bound to carry either persons or property for a reasonable compensation.

So, in the absence of a specific contract, a tenant is bound to pay a reasonable rental for the use of the leased premises.

Thus, a large number of instances might be cited where the law would imply a reasonable compensation for the use of property or persons, or both; yet, we know of no instance where, in arriving at what is a just or reasonable compensation, either the incumbrance upon the property, or the unusually high price paid for material, or the lack of skill in the mechanic who constructed the property, or the rascality of those in charge of the construction or management was taken into consideration by any court in determining what was a reasonable compensation. These propositions are elementary. It needs no citation of authorities to support them.

Then, if railroading is a business, and no one would dispute it, we can see no reason why it should not be governed by the same rules of law as any other business is in determining what is and what is not a reasonable compensation.

Every presumption is in favor of the validity of the act in question. The act will not be presumed to be repugnant to the Constitution of the United States, or of the State; and it must be made to appear affirmatively that it is so repugnant to the Constitution.

In *Reagan* v. *Farmers' Loan and Trust Company*, 154 U. S. 362–395, it is said: "It is not to be supposed that the legislature of any State, or a commission appointed under the authority of any State, will ever engage in a deliberate attempt to cripple or destroy institutions of such great value to the community as the railroads, but will always act with the sincere purpose of doing justice to the owners of railroad property, as well as to other individuals."

This being so, then it must be made clearly to appear from the pleadings and the evidence that the legislature, in passing the act in question, did not, in fact, do justice to the several railroads affected by the act; and that by reason thereof the plaintiffs below were injured in their property rights as stockholders in such company or companies. It must follow that, before the decree below can be sustained, the following propositions of fact must have been established by competent evidence: (a) That the plaintiffs below were stockholders in the respective corporations, as alleged; (b) That each of the railroads is operated in a prudent and economical manner; (c) That, when so managed, the reduction of rates provided for in the act, when taken in connection with all the other earnings of the several companies, will deprive such company of a just or reasonable compensation for the services so performed; (d) The plaintiffs below attacked the constitutionality of the act; the burden, therefore, was upon them to establish every essential element of fact necessary to show the invalidity of the act.

The answer of appellants puts in issue every one of the above questions of fact, save the one as to the plaintiffs below being stockholders, which is admitted. We call the court's attention, then, to the fact that there is wanting any competent evidence tending to show that either of these railroads is prudently or economically managed; and to the further fact that there is not any evidence tending to show the income from all the business of the several companies from all sources.

After paying expenses of operation, who is to determine what are reasonable rates?

Lord Ellenborough, in *Aldnut* v. *Inglis*, 12 East, 527, 537, said: "There is no doubt that the general principle is favored, both in law and justice, that every man may fix what price he pleases upon his own property, or the use of it; but if for a particular purpose the public have a right to resort to his premises and make use of them, and he have a monopoly in them for that purpose, if he will take the benefit of that monopoly, he must, as an equivalent, perform the duty at-

tached to it on reasonable terms." This is cited with approval in *Munn* v. *Illinois*, 94 U. S. 127; and it is said in the latter case, page 132 : " Certainly, if any business can be clothed ' with a public interest and cease to be *juris privati* only,' this has been."

If it be true that railroad property ceases to be *juris privati*, and is clothed with a quasi-public use, whenever the operation of such railroad is undertaken, then it must follow as a corollary thereto that all parties dealing with such property, or taking security upon such property, must take such property or security thereon with notice of such quasi-public use. In *Reagan* v. *Mercantile Trust Co.*, 154 U. S. 413, 416, in the opinion it is said : " By the act of incorporation, Congress authorized the company to build its road through the State of Texas. It knew that, when constructed, a part of its business would be the carrying of persons and property from points within the State to other points also within the State ; and that in so doing it would be engaged in a business, control of which is nowhere by the Federal Constitution given to Congress. It must have known that, in the nature of things, the control of that business would be exercised by the State."

If this presumption of knowledge is true of Congress and as to the holders of the bonds of the Union Pacific Company, it must be equally true of the holders of bonds of each of the other companies to these actions. It follows then :

(1) The right of the State to fix a reasonable maximum freight rate upon all freight shipped from one point in the State to another point in the State is paramount to any right which is or may be acquired by any bondholder, whether that bondholder be the Government or a private individual.

(2) The right of the State being a superior right, in determining what is a reasonable rate, the interest of such bondholder cannot be set up or considered as against the interest of the State.

(3) In determining the reasonableness of the rates it cannot be other than such a rate as will pay the expense of operation, when prudently and economically managed, and something more, at least, for the use of the company.

The next question which naturally arises is, who is to determine what such excess above operating expenses shall be? Is it a question for the courts, or is it a question of public policy, and therefore a question for the legislature?

It is stated in the opinion in the *Railroad Commission case*, 116 U. S. 307, that : "The power to regulate is not a power to destroy, and the limitation is not the equivalent to confiscation. Under the pretext of regulating fares and freights, the State cannot require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to a taking of private property for public use, without just compensation or without due process of law." This quotation is cited by Justice Brewer in the *Reagan case*, 154 U. S. 362, 398, with approval.

A careful review of all the cases, both state and Federal, we think, will show the true rule to be that, so long as the legislation itself does not operate to deprive the individual or corporation of his or its property, nor require the actual use of the property of the individual or corporation without compensation, then such legislation cannot be said to be in conflict with either the state or Federal Constitution. What such compensation shall be, after paying operating expenses, is purely a question of public policy to be determined by the legislature and not by the courts. If this be true, certainly there was error in the Circuit Court, decreeing a perpetual injunction against the law in question. The evidence establishes beyond question that the rates fixed under this law will produce an income considerably more than sufficient to pay operating expenses.

So long as an act is constitutional in all other respects and provides a rate sufficient to more than pay operating expenses, it is a question of legislative policy and one which the courts cannot inquire into. It cannot be successfully contended that so long as the rate fixed pays something above operating expenses to the corporation for the carrying of property, it amounts to the taking either of the use or of the property. It may be said that just compensation is equivalent to reasonable compensation. Then the question is, who is to determine

the question of reasonableness? Is it the courts, or is it the legislature? It seems to us, that if the legislation does not actually deprive the corporation of its property, nor require it to carry persons or property without reward, sufficient to more than pay operating expenses economically administrated, it is purely a question of public policy into which the courts cannot inquire.

The Constitution itself contains no provision restricting the power of the States as to such legislation. It has, indeed, been contended that, where such legislation was applied to a corporation, it constituted a violation of a contract with the State embodied in the charter, and was thus brought within the provisions of article 1, section 10. But this argument has been rejected by the Supreme Court, even when the charter contained no express power of amendment and repeal. See *Ruggles* v. *Illinois*, 108 U. S. 526. It was early decided that the first eight amendments did not limit the power of the States, *Barron* v. *Baltimore*, 7 Pet. 243; and it may now be assumed that the power of the states in this respect is unlimited, so far as the Federal Constitution is concerned, unless restricted by the provision of the Fourteenth Amendment, that no State shall "deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." The question is, in fact, therefore purely of the construction and scope of that amendment.

In *St. Louis & San Francisco Railway* v. *Gill*, 156 U. S. 649, Mr. Justice Shiras sums up what has been determined: "This court has declared, in several cases, that there is a remedy in the courts for relief against legislation establishing a tariff of rates which is so unreasonable as to practically destroy the value of property of companies engaged in the carrying business, and that especially may the courts of the United States treat such a question as a judicial one, and hold such acts of legislation to be in conflict with the Constitution of the United States as depriving the companies of their property without due process of law, and as depriving them of the equal protection of the laws." We take it, then, that this is

as far as the courts have gone. Such legislation, then, must be shown to be such as to deprive the companies of their property without due process of law, or as to deprive them of the equal protection of the laws. But it is said in this same case, at page 663: "The opinion of this court on appeal was that, while it was within the power of a court of equity in such case to decree that the rates so established by the commission were unreasonable and unjust, and to restrain their enforcement, it was not within its power to establish rates itself, or to restrain the commission from again establishing rates." If it is not, then, within the power of the court to establish rates itself, it must exist within the legislative power, restricted only so far as not to fix such rates so low as to deny the companies the right of property or the equal protection of the law. It must follow, then, that so long as the rate fixed by the law will pay the operating expenses when economically administered, and something in addition thereto, the power of the court ends, and the extent to which rates must produce profits is one of political policy.

Mr. Webster closed by considering in detail the reports of earnings and expenses, as tabulated in the evidence, and by the counsel.

*Mr. William J. Bryan* for appellants.

I. The several States have the right to fix, either directly through an act of the legislature or indirectly through a commission, reasonable maximum freight and passenger rates upon traffic wholly within their borders. *Chicago, Burlington & Quincy Railroad* v. *Iowa,* 94 U. S. 155; *Peik* v. *Chicago & Northwestern Railway,* 94 U. S. 164; *Chicago, Milwaukee & St. Paul Railroad* v. *Ackley,* 94 U. S. 179; *Winona & St. Peter Railroad* v. *Blake,* 94 U. S. 180; *Illinois Central Railroad* v. *Illinois,* 108 U. S. 541; *Railway Commission cases,* 116 U. S. 307; *Wabash, St. Louis & Pacific Railway* v. *Illinois,* 118 U. S. 557; *Dow* v. *Beidelman,* 125 U. S. 680; *Covington &c. Turnpike Co.* v. *Sandford,* 164 U. S. 578.

II. As a general rule, the power of the courts to suspend the enforcement of a schedule of rates fixed by a State legislature or by a railway commission can only be invoked when such rates yield an, income so small as to leave absolutely nothing above operating expenses. *Chicago, Milwaukee &c. Railway* v. *Minnesota*, 134 U. S. 418; *Chicago & Grand Trunk Railway* v. *Wellman*, 143 U. S. 339; *Reagan* v. *Farmers'. Loan & Trust Co.*, 154 U. S. 362; *St. Louis & San Francisco Railway* v. *Gill*, 156 U. S. 649; *Covington &c. Turnpike* v. *Sandford*, 164 U. S. 578.

In *Chicago & Northwestern Railway* v. *Dey*, 35 Fed. Rep. 866, 878, Mr. Justice Brewer said: "Counsel for complainant urge that the lowest rates the legislature may establish must be such as will secure to the owners of the railroad property a profit on their investment at least equal to the lowest current rate of interest, say 3 per cent. Decisions of the Supreme Court seem to forbid such a limit to the power of the legislature in respect to that which they apparently recognize as a right of the owners of the railroad property to some reward; and the right of judicial interference exists only when the schedule of rates established will fail to secure to the owners of the property some compensation or income from their investment. As to the amount of such compensation, if some compensation or reward is in fact secured, the legislature is the sole judge."

Such was also the principle established in the *Granger cases* in 94 U. S., where the court said: "Where property has been clothed with a public interest, the legislature may fix a limit to that which in law shall be reasonable for its use. This limits the courts, as well as the people. If it has been improperly fixed, the legislature, not the courts, must be appealed to for the change." This doctrine was reaffirmed in *Dow* v. *Beidelman*, 125 U. S. 680.

III. There may be special instances in which the courts will refuse to interfere, even though the rates fixed do not yield enough to pay operating expenses.

In *Chicago & Grand Trunk Railway* v. *Wellman*, Mr. Justice Brewer said: "It is agreed that the defendant's oper-

ating expenses for 1888 were $2,404,516.54. Of what do these operating expenses consist? Are they made up partially of extravagant salaries — fifty to one hundred thousand dollars to the president and in like proportion to subordinate officers? Surely, before the courts are called upon to adjudge an act of the legislature fixing the maximum passenger rates for railroad companies to be unconstitutional, on the ground that its enforcement would prevent the stockholders from receiving any dividends on their investments, or the bond-holders any interest on their loans, they should be fully advised as to what is done with the receipts and earnings of the company, for if so advised it might clearly appear that a prudent and honest management would, within the rates prescribed, secure to the bondholders their interest and to the stockholders reasonable dividends. While the protection of vested rights of property is a supreme duty of the courts, it has not come to this, that the legislative power rests subservient to the discretion of any railroad corporation which may, by exorbitant and unreasonable salaries or in some other improper way, transfer its earnings into what it is pleased to call operating expenses." The above language was quoted with approval by Mr. Justice Shiras in delivering the opinion of the court in *St. Louis & San Francisco Railway* v. *Gill.*

In *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, Mr. Justice Brewer said :

" It is unnecessary to decide, and we do not wish to be understood as laying down an absolute rule, that in every case a failure to produce some profit to those who have invested their money in the building of a road is conclusive that the tariff is unjust and unreasonable ; and yet justice demands that every one should receive some compensation for the use of his money or property, if it be possible without prejudice to the rights of others. There may be circumstances which would justify such a tariff ; there may have been extravagance and a needless expenditure of money ; there may be waste in the management of the road ; enormous salaries, unjust discrimination as between individual shippers, resulting in general loss. The construction may have been at a time

when material and labor were at the highest price, so that the actual cost far exceeds the present value ; the road may have been unwisely built in localities where there is not sufficient business to sustain a road. Doubtless, too, there are many other matters affecting the rights of the community in which the road is built, as well as the rights of those who have built the road."

IV. The evidence in the cases at bar shows that the rates allowed by the Nebraska statute will yield to each and every railroad in the State a profit upon its investment over and above operating expenses.

V. Upon the foregoing propositions of law and fact the judgment of the court below should be reversed and the rates fixed by statute allowed to stand.

VI. But in case this court shall hold that it has the right to pass upon the reasonableness of the profit allowed to the railroads of Nebraska by the statute under consideration, then, in such case, appellants contend —

(*a*) That the present value of the roads, as measured by the cost of reproduction, is the basis upon which profit should be computed.

In endeavoring to establish a reasonable rule we are bound to consider the conditions which surround other occupations. Railroads are built, owned and operated by corporations ; corporations are fictitious persons created by law ; laws are made by the people through their representatives. It cannot be assumed that natural persons would intentionally create fictitious persons and endow them with rights and privileges greater than they themselves enjoy. Neither can it be assumed that the natural persons who make the laws desire to exempt corporations, the creatures of law, from the vicissitudes which surround themselves. The ordinary business man cannot avail himself of watered stock or fictitious capitalization, nor can he protect himself from falling prices. If his property rises in value, he profits thereby ; so do the owners of a railroad under similar conditions. If his property falls in value, he loses thereby ; so must the owners of a railroad under similar conditions, unless it can be shown that railroad property

deserves more protection than other forms of property.  Can
it be said that the railroad which carries the farmer's crop to
market merits greater consideration than the farmer who
raises the crop ?   Can it be said that the railroad which carries
a manufactured product to market merits greater consideration
than the manufacturer ?   Can it be said that the common car-
rier is deserving of greater consideration than the ordinary
business man whose merchandise gives the railroad a reason
for existence ?   Is the man who carries property from producer
to consumer a more important factor in society than both
producer and consumer ?

Such a rule does not do injustice to stockholders and those
who desire to purchase stock.   If the owners of the road have
bonded the road for enough money to cover its present value,
their stock does not represent value.   The owners of such a
road stand in the same position as the owner of a farm who
has incumbered it for all it is worth ; his equity of redemption
is a legal title without a market value.   They stand in the
same position as the owner of a business block or of a stock
of merchandise who has obtained the entire value of his prop-
erty from a mortgagee.

Such a rule does not do injustice to the holders of railroad
bonds ; if their bonds do not exceed the present value of the
property, they can expect an interest ; if their bonds exceed
in amount the present value of the property, they stand in the
position of any other mortgagee who loans upon insufficient
security or whose security diminishes in value after the loan
is made.   The only recourse the mortgagee usually has if his
security becomes insufficient is to take the title to the prop-
erty.   If the first mortgage bonds equal or exceed the value
of the property, then the holders of subsequent liens stand in
the same position as the man who invests in a second mort-
gage when the first mortgage covers the value of the
property.

There can be no distinction made between bondholders and
stockholders.   If the States have a right to regulate rates,
stockholders cannot resist the demand for reasonable rates by
building the road with borrowed money.   The stockholder

invests in railroad stock, knowing that the road can only charge a reasonable rate and earn a reasonable r turn. The man who loans money to a railroad stands upon an equal footing with the stockholder, and, as against the State or the patrons, can assert no greater right than that possessed by the stockholders. Bondholders may foreclose their lien and become owners of the road. As against the State or the patrons they can have no higher privileges as bondholders before becoming owners than they have later as owners if it becomes necessary to take the road to satisfy their lien.

In support of the proposition that railroads should be placed upon the same footing as an ordinary business enterprise, it may be suggested that it is against public policy to raise up in any community or country a few persons, natural or corporate, and exempt them from the dangers and liabilities which must be encountered by the people in general. Those who are in possession of a monopoly are apt to be indifferent, if not actually hostile, to the interests of those who are immediately affected by a change in the business conditions of the country. If, for instance, railroad owners can demand a return upon capital never actually invested in the construction of the road or upon the original cost when the property has decreased in value, they not only have an unfair advantage over those who are subjected to competition, but may actually profit by conditions which are disastrous to others. An unrestrained monopoly preys upon all those who are so situated that they cannot themselves enter into a monopoly.

An additional reason why the court should not enforce the demands of the railroads for returns upon inflated stocks and bonds is to be found in the fact that such action on the part of the courts would greatly embarrass, if not entirely defeat, the effort which is being made in various States to prevent the overcapitalization of railroads. The constitution of Nebraska, article XI, section 5, contains the following provision:

"No railroad corporation shall issue any stock or bonds

except for money, labor or property actually received and applied to the purposes for which such corporation was created, and all stock dividends and other fictitious increase of the capital stock or indebtedness of any such corporation shall be void."

No one will question the wisdom of this constitutional restriction, and yet it will be impotent to protect the people from watered stock if the courts establish a rule which will enable the railroad companies to collect an income upon over-capitalization.

In comparing the rights of the patrons of the road with the rights of the holders of stocks and bonds, it must be remembered that the patron relies upon the law which compels common carriers to offer their services for reasonable compensation, while the purchaser of railroad stocks or bonds only suffers from his own negligence if he fails to learn whether the money represented by those stocks and bonds actually went into the road or found its way into the pockets of railway promoters. If a person contemplates purchasing railroad bonds, he can inquire whether the railroad's indebtedness exceeds the cost of reproducing it; if he fails to make such inquiry he ought to have no standing in a court of equity. He may be an innocent purchaser of bonds in the sense that the railroads issuing the bonds cannot make a legal defence to his claim, but he is not an innocent purchaser in the sense that the court must give actual value to his investment. In like manner the purchaser of stock can inquire whether the stock represents actual value. If he fails to inquire, or buys with knowledge that the debts exceed the cost of reproducing the road, he has no equity which a court can enforce.

The evidence shows that the railroads of Nebraska can be reproduced complete for about twenty thousand dollars per mile.

The following table, taken from the brief of associate counsel, shows the amount of stock and bonds issued by the various railroads which are parties to this suit:

|  | Capital stock per mile. | Funded debt per mile. | Total per mile. |
|---|---|---|---|
| C., B. & Q. . . . . . . . . . . | $14,439 | $22,034 | $36,473 |
| C., St. P., M. & O. . . . . . . | 25,103 | 17,504 | 42,608 |
| F., E. & M. V. . . . . . . . | 23,352 | 16,238 | 39,590 |
| U. P. R'y . . . . . . . . . | 33,318 | 70,468 | 103,786 |
| O. & R. V. . . . . : . . . . | 5,021 | 12,324 | 17,345 |
| St. J. & G. I. . . . . . . . . | 18,322 | 34,768 | 53,060 |
| K. C. & O. . . . . . . . . . | 22,769 | 14,007 | 36,007 |
| Mo. Pacific . . . . . . . . | 44,746 | 48,462 | 93,208 |
| Pacific R. R. in Neb. . . . . . | 15,010 | 15,000 | 30,010 |
| K. & B. H. . . . . . . . . . | 14,175 | 13,496 | 27,625 |
| C., R. I. & P. . . . . . . . . | 16,822 | 19,545 | 36,368 |

This table shows upon how large an amount of fictitious capital the roads will collect an income if allowed to collect from patrons enough money to pay interest upon all bonds and dividends upon all stock issued.

(*b*) The rates fixed in the statute under consideration allow to the railroads of Nebraska a reasonable profit upon the present value of the roads. The evidence in support of this proposition has been discussed by associate counsel.

VII. Counsel for appellees insists that competition gives to the patrons of a railroad full and complete protection from extortionate rates. This argument is sufficiently answered by the decisions already rendered by this court, wherein it has repeatedly affirmed the right of the State to regulate railroad rates, but it may be added that a railroad is to a certain extent a monopoly; it is only because it is a monopoly that it can collect unreasonable rates. Competition can only act within certain limits. If a railroad is built between two points, no other road can be built between those points (unless it mortgages the future) until the first road is realizing an income practically double a reasonable return upon the value of the road, because a new road would require an investment equal to the value of the first road, and until transportation rates on business done would pay running expenses and a reasonable profit on both investments competition would be prohibited. When two roads are built they

must necessarily collect more in tolls than one road would be justified in collecting. The evidence in this case shows that the Union Pacific Railroad is capitalized (including both stock and bonds) at more than five times the cost of reproducing that portion of the road which lies within the State of Nebraska. If it should attempt to realize upon all of this capitalization it would probably encourage the building of a parallel line, but it can charge rates grossly excessive without fear of competition as to local traffic. The very existence of the road prevents the building of a new road capitalized at present cost, and, even if a new road should be built, commerce would be compelled to bear a higher burden than it would if this road were limited to a scale of charges which would produce a reasonable return upon its actual value. See opinion of the court in *Chicago, Rock Island & Pacific Railway* v. *Union Pacific Railway*, 47 Fed. Rep. 15.

VIII. Counsel for appellees insists that the rates fixed by railroad companies may be unreasonable and yet not unreasonable enough to give state legislatures a right to lower them; he divides rates into reasonable, not reasonable and unreasonable. Under the head of reasonable rates he includes what they should charge; under the head of not reasonable rates he includes those which the railroads may charge, but should not; under the head of unreasonable rates he includes those which the roads must not charge. This division is not supported by authority. The law which requires carriers to transport goods at a reasonable compensation is an absolute one and does not depend upon the motive of the carrier. There is no twilight period between reasonable rates and unreasonable rates; rates which are reasonable may be charged; rates which are not reasonable cannot be charged.

*Mr. J. M. Woolworth* for appellees.

I. These decrees were right because the rates of charge prescribed and limited in the act known as "House Roll 33" were insufficient to yield to the companies reasonable compensation for their services in transporting property from one point to another within the State.

(*a*) The doctrine has been firmly established by a long series of the judgments of this court, beginning with the *Granger cases* decided in the year 1876, that the legislature may prescribe and limit the charges which railroad companies may make for their services in transporting persons and goods for the public. But this doctrine has been qualified and restrained. It has been again and again declared by this court that the power of the legislature in this matter is not unlimited; that it cannot be carried so far as to require them to carry persons or property without reward, because the imposition of such charges would operate the taking of private property for public use without just compensation and without due process of law.

In the *Railroad Commission cases*, 116 U. S. 307, 331, Mr. Chief Justice Waite, speaking for the court, while sustaining the legislative power to fix rates to be charged by railroad companies, in order to guard against any unjust application of the doctrine, took the precaution to say:

"From what has thus been said, it is not to be inferred that this power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretence of regulating fares and freights, the State cannot require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to a taking of private property for public use without just compensation or without due process of law."

In *Dow* v. *Beidelman*, 125 U. S. 680, 689, Mr. Justice Gray, speaking for the court, quoted this language with approval.

In *Georgia Railroad & Banking Co.* v. *Smith*, 128 U. S. 174, 179, Mr. Justice Field, delivering the opinion of the court, said that the power of the legislature to prescribe the charges of a railroad company for the carriage of persons and merchandise is "subject to the limitation that the carriage is not required without reward, or upon conditions amounting to the taking of property for public use without just compensation."

In the *Chicago & St. Paul Railway* v. *Minnesota*, 134 U. S. 418, 458, Mr. Justice Blatchford, speaking for the court, said:

"If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus, in substance and effect, of the property itself, without due process of law, and in violation of the Constitution of the United States; and in so far as it is thus deprived, while other persons are permitted to receive reasonable profits upon their invested capital, the company is deprived of the equal protection of the laws."

In the *Chicago & Grand Trunk Railway* v. *Wellman*, 143 U. S. 339, Mr. Justice Brewer delivering the opinion of the court, after reiterating the principle that an act of the legislature was not necessarily unconstitutional which fixed rates, said:

"The legislature has power to fix rates, and the extent of judicial interference is protection against unreasonable rates;" that is, against unreasonable rates prescribed and limited by an act of the legislature.

In *Budd* v. *New York*, 143 U. S. 517, Mr. Justice Blatchford said that the legislative "power of limitation or regulation is not without limit, and is not a power to destroy or a power to compel the doing of the services without reward, or to take private property for public use without just compensation or without due process of law."

In *Reagan* v. *The Farmers' Loan & Trust Co.*, 154 U. S. 362, 399, Mr. Justice Brewer, again speaking for the court, said:

"In every constitution is the guarantee against the taking of private property for public purposes without just compensation. The equal protection of the laws, which, by the Fourteenth Amendment, no State can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another, or of the public. This, as has been often observed, is a government of law and not a government of men; and it must never be forgotten that under such a government, with its constitutional limitations and guarantees, the forms of law and the machinery of government with all their reach and power, must in their

actual workings stop on the hither side of the unnecessary and uncompensated taking or destruction of any private property, legally acquired and legally held."

In *St. Louis & San Francisco Railway* v. *Gill*, 156 U. S. 649, Mr. Justice Shiras, delivering the opinion of the court, said in the course of it: "That there is a remedy in the courts for relief against legislation establishing a tariff of rates which is so unreasonable as to practically destroy the value of property of companies engaged in the carrying business, and that especially may the courts of the United States treat such a question as a judicial one, and hold such acts of legislation to be in conflict with the Constitution of the United States, as depriving the companies of their property without due process of law, and as depriving them of the equal protection of the laws."

And, in *Covington & Lexington Turnpike Road Co.* v. *Sandford*, 164 U. S. 578, 594, Mr. Justice Harlan, delivering the opinion of the court, reviewed many of the cases above cited and said:

"A statute which, by its necessary operation, compels a turnpike company, when charging only such tolls as are just to the public, to submit to such further reduction of rates as will prevent it from keeping its road in proper repair, and from earning any dividends whatever for stockholders, is as obnoxious to the Constitution of the United States as would be a similar statute relating to the business of a railroad corporation having authority, under its charter, to collect and receive tolls for passengers and freight."

(*b*) The question of fact remains whether House Roll 33 limited the charges which railroad companies may make for the carriage of goods so that their earnings would not cover the cost of doing the business and some compensation therefor.

(1) One method of determining whether rates prescribed by the legislature are reasonable is to put them in force for one, two or three years, and at the end of a proper period ascertain from the accounts of the business what the companies earned or lost. This method, however, is open to an obvious objection: if after statutory rates have been in

operation a certain period it appears that the companies have not realized any compensation for their services, the loss sustained by them cannot in any way be made good.

(2) There is another method of testing the reasonableness of statutory rates : it is to take the business for one, two, three or more years immediately before the passage of the act and by applying the rates to it, ascertain what they would have yielded. For instance, suppose the case of a road with a paid-up capital of four million dollars, earning in the year just before the statutory rates were prescribed, one million dollars per annum, of which sixty per cent or six hundred thousand dollars went to cost of operation, and forty per cent or four hundred thousand dollars to dividends. Now suppose the rates charged by the company were reduced by statute so that had they been in force the year before, its earnings would have been only five hundred thousand dollars, while its operating expenses continued to be six hundred thousand dollars, so that not only would the stockholders receive no dividend, but the company would sustain an actual loss of one hundred thousand dollars. Let this process be applied not only to the business of one year immediately preceding the passage of the statute, but to the second and the third years and as far back as the inquiry could be carried, with the same result. This method would amount almost to a demonstration that the statutory rates will not in the future yield a reasonable return for the services rendered by the company. This method is just as legitimate as the other; in one, as well as the other, actual figures taken from the accounts of the company are dealt with, and no guesses or estimates or calculation of contingencies are indulged, while the process of computation is exactly the same.

(c) I shall begin the inquiry whether House Roll 33, had it been put in force during any one of three years immediately preceding its passage, would have yielded any compensation to the companies for their services; and I shall give figures about which there is no room for disagreement and which are least favorable to our contention. I propose to show not that the statutory rates would not have yielded to the

companies reasonable compensation for their services, but
that they would not have yielded even cost of the business.
I shall not complicate the inquiry by showing that these
rates would have yielded nothing to apply on the interest of
the debts of the companies, or on the cost or value of the
road, or any returns, by way of dividends or otherwise, to the
stockholders.    I lay interest on bonds and mortgages and
debts however evidenced and dividends to stockholders en-
tirely out of view.

As the result of his examinations Mr. Woolworth presented
two tables which he contended were established by the evi-
dence.

Table 1, showing the percentage of expenses to earnings
for 1891, 1892, 1893.

| NAME OF ROAD. | Reductions by the bill. | Cost of doing all business. | Extra cost of local business. | Total. |
|---|---|---|---|---|
| **1891 —** | | | | |
| B. & M. . . . . . . . . . | 29.50 | 66.24 | 10 | 105.74 |
| C., St. P., M. & O. . . . . | 29.50 | 70.78 | 10 | 110.28 |
| F., E. & M. V.  . . . . . | 29.50 | 49.87 | 10 | 89.37 |
| U. P. Ry. . . . . . . . | 29.50 | 68.94 | 10 | 108.44 |
| O. & R. V. . . . . . . . | 29.50 | 120.26 | 10 | 159.76 |
| St. J. & G. I. . . . . . . | 29.50 | 96.44 | 10 | 135.94 |
| K. C. & O. . . . . . . . | 29.50 | 99.54 | 10 | 139.04 |
| **1892 —** | | | | |
| B. & M.   . . . . . . . | 29.50 | 64.23 | 10 | 103.73 |
| C., St. P., M. & O. . . . . | 29.50 | 65.96 | 10 | 105.46 |
| F., E. & M. V. . . . . . | 29.50 | 70.71 | 10 | 110.21 |
| U. P. Ry. . . . . . . . | 29.50 | 56.44 | 10 | 95.94 |
| O. & R. V. . . . . . . . | 29.50 | 93.12 | 10 | 132.62 |
| St. J. & G. I. . . . . . . | 29.50 | 74.23 | 10 | 113.73 |
| K. C. & O. . . . . . . . | 29.50 | 75.19 | 10 | 114.69 |
| **1893 —** | | | | |
| B. & M.   . . . . . . . | 29.50 | 65.51 | 10 | 105.01 |
| C., St. P., M. & O. . . . . | 29.50 | 64.58 | 10 | 104.08 |
| F., E. & M. V. . . . . . | 29.50 | 53.66 | 10 | 93.16 |
| U. P. Ry. . . . . . . . | 29.50 | 58.51 | 10 | 98.01 |
| O. & R. V.  . . . . . . | 29.50 | 94.14 | 10 | 133.64 |
| St. J. & G. I. . . . . . . | 29.50 | 62.05 | 10 | 101.55 |
| K. C. & O. . . . . . . . | 29.50 | 76.50 | 10 | 116.00 |

| Name of Road. | Total amount received for tons carried locally. | Total amount of reduction caused by H. R. 33. | Expenses of all business. | 10 % for extra cost of local business. | Total deductions. | Gain or loss. |
|---|---|---|---|---|---|---|
| **1891—** | | | | | | |
| B. & M. | 1,066,871 | 314,726 | 706,695 | 106,687 | 1,128,108 | − 61,237 |
| C., St. P., M. & O. | 110,933 | 37,725 | 78,518 | 11,093 | 127,336 | − 16,403 |
| F., E. & M. V. | 348,408 | 102,780 | 173,751 | 34,840 | 311,371 | + 37,037 |
| U. P. | 278,211 | 82,072 | 191,798 | 27,821 | 301,691 | − 23,480 |
| O. & R. V. | 75,581 | 22,296 | 90,803 | 7,558 | 120,747 | − 45,166 |
| St. J. & G. I. | 21,817 | 6,486 | 21,040 | 2,181 | 29,657 | − 7,840 |
| K. C. & O. | 6,732 | 1,985 | 6,751 | 673 | 9,359 | − 2,627 |
| **1892—** | | | | | | |
| B. & M. | 1,237,884 | 365,175 | 795,093 | 123,788 | 1,284,056 | − 46,172 |
| C., St. P., M. & O. | 123,033 | 36,294 | 81,152 | 12,303 | 129,749 | − 6,716 |
| F., E. & M. V. | 336,714 | 99,310 | 238,090 | 33,671 | 371,071 | − 34,357 |
| U. P. | 398,262 | 117,487 | 224,779 | 39,826 | 382,092 | + 16,170 |
| O. & R. V. | 88,335 | 26,043 | 82,257 | 8,833 | 117,133 | − 28,798 |
| St. J. & G. I. | 31,004 | 8,836 | 23,014 | 3,100 | 34,950 | − 3,946 |
| K. C. & O. | 6,630 | 1,889 | 4,985 | 663 | 7,537 | − .907 |
| **1893—** | | | | | | |
| B. & M. | 1,242,416 | 366,512 | 813,906 | 124,241 | 1,304,659 | − 62,243 |
| C., St. P., M. & O. | 142,542 | 42,049 | 92,053 | 14,254 | 148,356 | − 5,814 |
| F., E. & M. V. | 424,437 | 125,208 | 227,752 | 42,443 | 395,403 | + 29,034 |
| U. P. | 413,714 | 122,045 | 242,064 | 41,371 | 405,480 | + 8,234 |
| O. & R. V. | 80,519 | 23,753 | 75,800 | 8,051 | 107,604 | − 27,085 |
| St. J. & G. I. | 33,802 | 9,971 | 20,974 | 3,380 | 34,325 | − .523 |
| K. C. & O. | 9,445 | 2,786 | 7,225 | 944 | 10,955 | − 1,510 |

These tables show that not one of these roads would have realized the cost of its local business in the three years ending June 30, 1891, 1892 and 1893, had their rates been those fixed by the House Roll 33, except the Fremont, Elkhorn & Missouri Valley in 1891 and in 1893, and the Union Pacific in 1892 and 1893; the Fremont Company would have earned 10.63 per cent in 1891, and in 1893 6.84 per cent; and the Union Pacific 4.06 in 1892, and 1.99 in 1893.

Mr. Woolworth also submitted the following as the result of the evidence concerning the values of the properties.

### The Burlington.

Mr. Taylor, the auditor of the company, who in one capacity or another has been in the accounting department ever since the construction of the road was begun, says that the same cost $74,616,523.02, including original construction, betterments, etc. He also says that the mileage of the Burlington is 2253.07, which would give about $33,000 per mile.

There is no suggestion in the record that the road was not honestly and economically built.

There is no direct proof of present value, but Mr. Taylor says that some of the properties are worth much more now than they were when acquired.

### Union Pacific.

Mr. Morgan was an engineer, called to their assistance by the Paterson Commission, which was charged by Congress with the examination, among other things, of the condition and value of the road. From his report several extracts are made, and one is an estimate of the cost of reproducing the road, which shows the cost per mile to be $26,814. This does not include terminals.

Mr. House, who was one of the original corps of engineers, affirms that estimate.

Mr. Calvert, who had been at first resident and afterwards chief engineer of the Burlington, in Nebraska, and was superintendent of that road when he testified (1254), says that the cost and value of a road which had become mature by time

and expenditure was from $33\frac{1}{2}$ to 50 per cent greater than one just built, which would increase the estimate of Mr. House and Mr. Morgan to from $35,752 to $40,221.

To this a large sum should be added for terminals, which Mr. Morgan estimates at $10,000,000 (1150). Mr House estimates them at $3,973,912 (1643). Either sum swells the cost of reproduction very largely.

### The Elk Horn & Omaha Roads.

The testimony is imperfect as to the present value and costs of these roads, as will be found on examination. It is definite enough for the Omaha terminals but can only be estimated for the rest of the property.

II. The provisions of the constitution of the State of Nebraska limit the competency of the legislature to fix railroad rates. Under those provisions, statutory rates must yield, not only cost and compensation the least possible, but in all contingencies cost and a fair profit.

III. House Roll 33 is unconstitutional because it attempts to fix and limit the rate which the Union Pacific Railway Company may charge for transportation of freight on its lines between points within the State. That company is within the language of the act, and the Board of Transportation so construes it.

The Union Pacific Railroad Company was incorporated by an act of Congress passed in 1862. An act amendatory of the charter was passed in 1864. This act authorized any or all of the companies mentioned therein to consolidate their organizations. (Sec. 16.) Under this authority the Union Pacific Railroad Company, the Kansas Pacific Railway Company, (at one time known as the Leavenworth, Pawnee & Western, and afterwards as the Union Pacific Railroad Company Eastern Division,) and the Denver Pacific Railway and Telegraph Company became consolidated under the name and style of the Union Pacific Railway Company.

The object of the incorporation of the company is stated in the original act to be " to secure the safe and speedy trans-

portation of the mails, troops, munitions of war and public stores" (Sec. 3), and "to promote the public interests and welfare by the construction of said railroad and telegraph and keeping the same in working order; and to secure to the Government at all times, but particularly in time of war, the use and benefit of the same for postal, military and other purposes." (Sec. 18.)

The service which the company was required to render to the Government was to " at all times transmit dispatches over said telegraph line, and transport mails, troops and munitions of war, supplies and public stores upon said railroad for the Government whenever required to do so by any department thereof, and that the Government shall at all times have the preference in the use of the same for all purposes aforesaid."

It is too late in the day to take a moment's time to prove that the States cannot interfere with any of the operations of the General Government. And in administering its affairs that Government may act directly by its own officers, or it may make use of any appropriate agency. In proper cases Congress may create a corporation to render certain services to the Government. At one time it created a bank to be the fiscal agent of the Government, and this court held that such a corporation was a proper means to effect its legitimate objects. *McCullough* v. *Maryland*, 4 Wheat. 316; *Osborn* v. *United States Bank*, 9 Wheat. 738.

And such an instrumentality, when once adopted by Congress for such purposes, is in its operations as far beyond any interference by a State as the army or navy or the postoffice. Attempts were made by two several States to tax the operations of the bank, but this court held such attempts futile. In the Pacific Railroad acts of 1862 and 1864 Congress granted to the Central Pacific Company some of the franchises which we have seen it granted to the Union Pacific Company, and the State of California attempted to tax them. This court held that for the State to lay such a tax was "not only derogatory to the dignity of the Federal Government, but was repugnant to its paramount sovereignty." *California* v. *Pacific Railroad Co.*, 127 U. S. 1.

The provisions of House Roll 33 apply to all railroad corporations doing business within the State of Nebraska, and include the Union Pacific, the Chicago, Burlington & Quincy, the Chicago & Northwestern, the Missouri Pacific and the Elkhorn Companies. The Federal corporation not being subject to the jurisdiction of the State in this respect, the result is that the act is unconstitutional and void, not only in respect of that company but in its whole scope and reach. It was beyond the competency of the legislature to enact the law in the words of it, and therefore it must fall.

IV. This case is within the jurisdiction of the court, whether it be considered as a court of the United States or as a court of equity.

*Mr. James C. Carter* for appellees.

Some of the claims asserted in defence of the Nebraska act may be generally stated thus:

1. That railroads are allowed to be built for the public benefit, and must, therefore, be made to subserve the benefit of the people; and that any private interest which may be involved is of secondary importance.

2. That all people having occasion to need the services of a railroad are entitled to them; and that the compensation required of them must be made to depend, not upon what the railroad can afford to render the services for, but upon what they can afford to pay.

3. That while it may be impossible to ascertain what the cost is for any particular service, it is possible to ascertain the average cost of the whole service rendered by a road, and fair to treat this average as the cost of any particular service; and consequently to assume that the cost of each particular service is everywhere the same.

4. That all persons have an equal right to the services of a railroad upon the same terms, notwithstanding that the actual cost of the service demanded by one may be much greater than that of the same service demanded by another.

5. That in fixing rates the value of the service to the one who demands it is unimportant; but that the one who needs

it most, and who obtains the greatest benefit from it, should pay no more for it than he who needs it least and obtains the least benefit from it.

6. That the carriage of goods to and from large and compact communities which furnish large amounts of transportation and thus enable the service to be performed at much less cost are not entitled to the benefit of this natural advantage, but that all parts of the State must be put upon an equality.

There are many other claims upon which this legislation is defended, but the above are sufficient for the only purpose for which they are now stated, namely, to point out the first necessity of this discussion; namely, a clear understanding of what railroad business really is, and had become, under and in pursuance of the contracts between the public and the railroad companies at the time when this legislation assumed to deal with it.

The leading features of the railroad system of the United States, as it has thus grown up and been established under every sanction of law and public sentiment, are these :

(a) That the prices of carriage are everywhere fixed, not by the railroads nor by shippers, but by the same imperious power which fixes the price of all other articles or services, namely, the pressure of competition. Against this determination it is irrelevant to argue justice or injustice; or, to speak more correctly, the decision of this power is always just. We do not complain of the decision in the case of food and clothing. We have no more right to complain of it in the case of the carriage of goods.

(b) Railroads charge the highest price they can profitably get, as every one else does who has goods to sell; and in some instances, where they have no competitors other than teams, they may be under the temptation to charge an excessive price. This they could not do permanently, but they might do it temporarily, and before the forces of competition could be brought into play. An excessive price is that indisputably unusual charge for services rendered under similar conditions

which reasonable men would declare extortionate. Against this danger there are two sufficient protections:

(1) A plain regard for self-interest will and does prevent it. Moderate charges yield more profit by the greatly increased business they draw. No railroad could make money by the practice of extortion. A sound policy, perfectly well known to railroad managers, advises them that it is best to tempt and draw out a large traffic by low prices than to try to make a large profit on a small business.

(2) No one need pay an excessive charge. The service can be exacted at a reasonable price. It may indeed cost a lawsuit; but so do all other social and business wrongs. The wrong cannot be very great which does not provoke resistance. The extremely small number of actual contests on this point are good evidence of the fact that this abuse is not frequent or extensive.

(c) Railroad rates exhibit great diversity, and the reason of many of them is not apparent to the observer who does not think of the conditions which free competition works out, and of the way in which the railroad system has grown up.

The cost of the service in particular cases has little to do with the making of the charge. What necessarily determines the carrier's conclusion in any case, where he is called upon to say whether he will take new traffic offered at a certain price, is how much, if any, cost in addition to what he is then under he will incur if he takes it.

His final aim is to get such an average rate for all his traffic as will yield him a profit. The proportions in which all his customers contribute to that average are settled by causes absolutely beyond either his or their will. A grocer's customer, who uses much tea and little sugar, would not say to him that he is doing a great injustice by exacting from him a profit of twenty-five per cent on the tea he buys, and at the same time selling his neighbor sugar at a profit of only five per cent.

(d) There is a common phrase that railroad rates are arranged so as to "get all the traffic will bear;" and this is true, although not in the odious sense which imputes a design to take advantage of supposed necessities in order to

exact an excessive compensation. In its real meaning it simply indicates to railroad managers the stern necessity which limits them to low rates in order to gain or to save traffic. When, in ways already indicated, they seek to gain traffic by competition with water carriage, they ascertain the rate which it is necessary for them to meet in order to secure it. They must take this rate or give up the struggle for the business; for it is "all the traffic will bear." At points where there is no competition except with other forms of land carriage, and little traffic at that, they fix rates calculated to build up the country and increase business; for such rates are "all the traffic will bear." If the great agricultural products are so low that farmers can make nothing by raising them and sending them to a market, the railroad man is obliged to make his rates such that the farmer can make something, or he will cease to attempt to raise such products, and the railroad will lose its chief business. He may find it necessary for his own interest to carry the traffic at actual cost, and sometimes even for less, for this is "all the traffic will bear."

(*e*) In saying that railroad business is subject, like ordinary industries, to the stress of competition, we do not express the whole truth. They are peculiarly sensitive to it, and much more than most other industries. Resorting to the just analogy heretofore suggested, that a railroad company may be regarded as the manufacturer and seller of transportation, some peculiarities which distinguish this from other manufactures should be noted.

In the first place the expense of manufacturing as compared with the price of the product is much larger than in other industries. In other industries this expense depends very largely upon the amount of business done; but in this it goes on and cannot be greatly reduced when little business is transacted. Again, the commodity produced by railroads, cannot, for want of a sufficient demand, be stored away and kept for a better market. If it is not sold to-day, because no fair price can be obtained for it, it can never be sold, and yet a large percentage of its cost which has already been incurred and paid must be lost.

These conditions put the managers of railroads under the constant spur of a desire to sell what they have on hand so as not to lose the expense it has already cost. Sellers of other goods always have the alternative, when the price is thought too low, of holding on to them with little additional expense for a better market.

(*f*) The operation of the laws of free competition in railroad, as in other business, is not unattended with possible mischiefs, but they are infinitely less than would flow from any attempt to dispense with such laws. These mischiefs, so far as prices are concerned, are really reducible to two:

(1) There is a possibility that competing roads may combine in order to prevent or mitigate the effects of competition. This in the case of railroads is an imaginary danger only. The combination may, indeed, be made, and sometimes even be absolutely necessary to prevent self-destruction. But the combination must always find its real interest in an increase of traffic by low rates rather than making a large profit by high rates on a decreased traffic. And should an unwise policy (never followed in present times) tempt the imposition of high rates, it would speedily be baffled by the appearance in the field of new roads and new competitors supplied with capital attracted from other less profitable pursuits. That is to say, competition cannot be really escaped by combination in the large businesses which are open to all. Where nature has limited the supply of a commodity, as in the case of mines producing the necessaries of life, coal, etc., a combination among all the proprietors may be made effective in raising the price. This is the case of true monopolies, which railroads are not. Perhaps a practical unification of ownership of all great trunk lines of railway may be brought about and all existing competitions be thus destroyed, and there might not be boldness enough on the part of other capitalists to prompt them to arrange a struggle with the new giant; as is supposed to be true with the great unified interests of sugar and petroleum. But combination on such a scale is without mischief so far as prices are concerned. Self-interest in such cases can

be promoted only by tempting an increase of consumption by offering the lowest possible price.

(2) The other possible mischief is the conversion of open into secret competition; that is by secretly obtaining traffic by giving to some better terms than to others. This is exhibited in the paying of rebates, or making special private contracts, and thus giving to some advantages not shared by all. Sometimes this practice is entirely proper and hurts no one, indeed benefits all; as in the case where shippers of bulky articles like lumber may be induced to withhold shipments until the winter season, when other traffic is slack, and not send it when the roads are crowded. The case is different, however, when secret bargains are made merely to carry traffic for one shipper at lower rates than for others. This is an unqualified abuse and public and private outrage. It is the last resort in a desperate and deadly competition. All railroad managers abominate it; but there is no rectitude which will not submit to it rather than die.

In respect to both these possible mischiefs the law provides protection. Both practices are, when not justified by reasonable and fair purposes, crimes, and punishable as such. It may be said that they are often not easy to be discovered, and therefore, that the criminal law is not a sure safeguard; but this is, to a greater or less degree, the case with all crimes. The fear of punishment will be sufficient to restrain within moderate limits the commission of the offence. It can never become general; and so can never defeat the general beneficent operation of free competition.

The present general condition of the law on the questions involved in the present controversy is believed to be as follows:

1. That it is within the scope of the legislative power to establish maximum rates for railroad charges.

2. That this power is not unlimited; and that the ascertainment and declaration of its limits are within the province of the judicial power.

3. What these limits are is as yet an open question except

in one particular; namely, the regulations must be reasonable.

4. That they transcend this limit and become unreasonable, whenever they operate so as to take away the property of the railroad companies.

5. What rules or principles must be observed in the framing of maximum rates in order to make them reasonable, other than the one above mentioned, that they must not take away property, is as yet an open question.

6. In particular, the question whether they are not unreasonable, if they impair a contract between the railroad companies and the State, and take away rights resting in contract is an open question.

7. What rights, resting in contract, railroad companies have, as against the State, is an open question.

8. Whether the State can determine by legislation the reasonable value of railroad service as between railroad and shipper, so as to oust, or to cripple, the jurisdiction of the courts to determine, in some form, that reasonable value is an open question. *Reagan* v. *The Farmers' Loan & Trust Co.*, 154 U. S. 362; *St. Louis & San Francisco Railway* v. *Gill*, 156 U. S. 649.

It is believed that the present legislation is clearly shown by the proofs in this case to be invalid within the principles already established by this court. The rates are unreasonable because they take away property without due-process of law; and, therefore, it is not necessary to determine either of the points above mentioned as being still open. But, at the same time, it is true that those points are directly raised and involved, and a discussion of them is relevant, and cannot with propriety be passed.

I. The business of a common carrier of goods at all times before the introduction of railroads, and ever since, has been the carriage of goods for hire. The law attached to this business the duty on the part of the carrier to carry all goods which any one might require him to carry. It gave him a corresponding right to charge for his services a reasonable compensation. What was in fact a reasonable compensation

is, from its very nature, a judicial question, and has always been so treated.

The carrier had, in addition, the common right of all citizens, to agree with his customer concerning the amount of his reward. In cases of such agreement, the question of reasonableness would necessarily disappear.

II. One can become a carrier by railroad only by the permission of the State. What the rights of such a carrier are, as against the State, depend upon the terms of his contract with the State by which he acquires the right. Under our system, which allows all to construct and operate railroads upon the same terms, the contract is made by a public offer, and its acceptance, by performing the consideration.

III. The nature of the right gained by the acceptance of such offers is ascertained by the simple inquiry what the offer is. In the case of a railroad, where there are no special conditions or limitations modifying the substance of the offer, (and in general, and in our particular cases, there are none.) the offer is of the right to carry on (with the structure) the business of a common carrier as it is ordinarily carried on. And to whatever conditions, either by way of legislative regulation, or otherwise, that business is ordinarily subject, it becomes subject when acquired by a railroad carrier in the manner above pointed out; and it becomes subject, undoubtedly, to such further governmental regulation as the new instrumentality employed may, in the public interest, reasonably require.

IV. In the discussions, judicial as well as forensic, concerning the power of state legislatures to regulate railroad rates and other similar charges, while the existence of the power has been affirmed, the nature of the power, the place to which it is assignable in the just scheme of government, and the conditions under which it may properly be exercised, have not received the attention to which they are entitled. References have been made to certain employments, such as those of millers, bakers, ferrymen, innkeepers, etc., the charges in which have been made from time to time from an early period the subjects of legislative regulation, and it has been impliedly

accepted as law, that these employments are, under all circumstances, subject to the interference of government, while other employments and businesses are not; but the reasons why this should be so have not been fully sifted. It is time that this element, which has served as the foundation of the most momentous conclusions, should be scrutinized and measured. We affirm the moderate proposition that the governmental power upon which alone this class of regulations can be defended is the police power. *Munn* v. *Illinois*, 94 U. S. 113, 125.

V. This is not an exercise of the police power at all, and is therefore a nullity.

VI. This legislation is unconstitutional. First, because it takes away the contract rights granted to, and vested in, the railroad companies by the public contracts under which they expended their capital in the construction of their roads. Second, because it immediately takes away the property of those companies without compensation, and without due process of law. Third, because it denies to them the equal protection of the laws.

VII. This whole controversy may be made to turn upon another single proposition, based substantially upon the same grounds, but differing in form from those already asserted; namely, the rates established by the act are not maximum rates, such as the legislature had power to establish.

VIII. The Nebraska act is invalid and void within the principles now fully recognized by this court for the reason that while on its face it pretends to regulate rates on Nebraska business alone it necessarily affects the business done in other States, and the rates of that business. Rates so regulated are, in very absolute sense, unreasonable.

IX. The business of transportation by rail in Nebraska consists in the performance of innumerable distinct items of carriage service for an innumerable number of persons and under every diversity of circumstance affecting the question of reasonable price for the service. It is submitted that the legislature of that State cannot, in any single instance, impose a rate which would preclude the railroad from a recovery before a court and jury of what the court and jury might find

to be the reasonable value of that service. This act utterly denies that right.

X. No one can deny, in view of the uniform decisions of this court, and especially in view of the last one on this subject, that the power of a state legislature to establish rates is not unlimited, but is subject to some sort of review in the courts. Upon any view of the province of the courts this act is invalid.

XI. The present condition of the decisions of this court upon the question of the authority of a legislature to establish maximum rates, leaves open for discussion, to say the least, every proposition advanced by me. No judgment of this court is opposed to any of them ; and the manifest tendency of the later decisions is to support them all.

XII. When the above questions are properly settled, our law in respect to maximum rates for railroad and other services will be brought into a more consistent form, which will at once secure individual rights and not unduly limit legislative powers; and then the propositions, which I have endeavored to support, will be found to be just.

XIII. But without solving any of the questions above asserted as open, and upon the law as now established, the Nebraska act is unconstitutional and invalid for the reason that the rates are so low as to leave no real compensation to the railroads, and amount, therefore, to a taking of property without due process of law, and to a denial to the railroads of the equal protection of the laws.

In conclusion *Mr. Carter*, after reviewing the cases, submitted the following as to the questions decided, and the questions left open.

A. *Points determined by the lines of decisions.*

1. That in the absence of provisions in the charters constituting contracts between the State and the company limiting the legislative power in respect to rates. the legislature has the power to fix maximum rates.

2. That this legislative power is not unlimited, and that it does not extend so far as to permit rates to be established

which will yield no return upon the investment and thus practically destroy the property.

3. That the question of what rates are reasonable, and what are unreasonable, is a judicial and not a legislative question.

### B. *Points left open to discussion.*

1. What is the nature of the legitimate power which the legislature may exercise upon the subject of rates? It was in substance declared, in the opinion in *Munn* v. *Illinois*, that it was the police power, but the real character of this power and its limitations were not then, and have not since been, much considered.

2. Where there are no express provisions in the charters respecting the amount of rates or the power to fix them, is there any implied grant of a right to charge reasonable rates? Does not the right to take tolls necessarily imply a power to take tolls to some certain amount or to some amount capable of being made certain? Can we help saying that it is a right to take reasonable tolls?

3. Can the court, when declaring that rates cannot be fixed at so low a point as to yield no return, because that would be a taking of property, stop at that point? If taking all profit is a destruction of property, does that destruction begin there? Does it not begin when the profit is reduced to a very small amount? And, therefore, is it not necessary to fix a point at which destruction begins, and can it be fixed anywhere except at the point of reasonableness?

### *Tendency of this line of decision.*

It is very plain that there has been a regular progress thus far, entirely in harmony with constitutional doctrine. It is clearly developed by limiting the decisions to the actual circumstances of the cases decided, and treating the language of opinions with the liberality which a true criticism enjoins. The progress is as follows:

1. The question first presented was whether the legislature had any power whatever to deal with rates. This was decided in the affirmative.

2. When the question was made whether provisions in charters not granting the right to specific rates, but permitting companies to fix reasonable rates, a decision was not compelled, because the proofs did not show the statutory rates to be unreasonable. Opinions differed.

3. When the suggestion was first pressed whether those judges who sanctioned the fullest exercise of legislative power would allow no limit to it, some of them, including Waite, C. J., himself, answered that the power did have its limitations; and when the question was first squarely made the majority held that it was limited.

4. When cases have been presented in which it was claimed that the rates were unreasonably low, but not clearly shown to be so, the court has declined to interfere.

5. When cases have been presented where the rates did not allow any substantial return on the capital, it has been unanimously held that the limit had been reached and passed, and the laws were held invalid.

6. The case seems not yet to have arisen where the rates were proved to reduce returns to a clearly unreasonable point, although not taking away all profit.

7. In recent cases the question has been mooted, and repeated in the very last decision, whether there is not an implied right under all charters to reasonable rates. Whenever this question presents itself in a manner not to be avoided, the affirmative will be found to be the only decision to which the foregoing tendencies lead, or which constitutional law can sanction.

Mr. Justice Harlan, after stating the case as above reported, delivered the opinion of the court.

The first question to be considered is one common to all the cases. While it was not objected at the argument that there had been any departure from the 94th Equity Rule, it was contended that the plaintiffs had an adequate remedy at law, and that the Circuit Court of the United States, sitting in equity, was therefore without jurisdiction. This objection is

based upon the fifth section of the Nebraska statute authorizing any railroad company to show, in a proper action brought in the Supreme Court of the State, that the rates therein prescribed are unreasonable and unjust and, if that court found such to be the fact, to obtain an order upon the Board of Transportation permitting the rates to be raised to any sum in the discretion of that Board, provided that in no case should they be fixed at a higher sum than was charged by the company on the first day of January, 1893. This section, it is contended, took from the Circuit Court of the United States its equity jurisdiction in respect of the rates prescribed and required the dismissal of the bills.

We cannot accept this view of the equity jurisdiction of the Circuit Courts of the United States. The adequacy or inadequacy of a remedy at law for the protection of the rights of one entitled upon any ground to invoke the powers of a Federal court, is not to be conclusively determined by the statutes of the particular State in which suit may be brought. One who is entitled to sue in the Federal Circuit Court may invoke its jurisdiction in equity whenever the established principles and rules of equity permit such a suit in that court; and he cannot be deprived of that right by reason of his being allowed to sue at law in a state court on the same cause of action. It is true that an enlargement of equitable rights arising from the statutes of a State may be administered by the Circuit Courts of the United States. *Case of Broderick's Will,* 21 Wall. 503, 520; *Holland* v. *Challen,* 110 U. S. 15, 24; *Dick* v. *Foraker,* 155 U. S. 404, 415; *Bardon* v. *Land & River Imp. Co.,* 157 U. S. 327, 330; *Rich* v. *Braxton,* 158 U. S. 375, 405. But if the case in its essence be one cognizable in equity, the plaintiff — the required value being in dispute — may invoke the equity powers of the proper Circuit Court of the United States whenever jurisdiction attaches by reason of diverse citizenship or upon any other ground of Federal jurisdiction. *Payne* v. *Hook,* 7 Wall. 425, 430; *McConihay* v. *Wright,* 121 U. S. 201, 205. A party by going into a national court does not, this court has said, lose any right or appropriate remedy of which he

might have availed himself in the state courts of the same locality; that the wise policy of the Constitution gives him a choice of tribunals. *Davis* v. *Gray*, 16 Wall. 203, 221; *Cowley* v. *Northern Pacific Railroad*, 159 U. S. 569, 583. So, "whenever a citizen of a State can go into the courts of a State to defend his property against the illegal acts of its officers, a citizen of another State may invoke the jurisdiction of the Federal courts to maintain a like defence. A State cannot tie up a citizen of another State, having property rights within its territory invaded by unauthorized acts of its own officers, to suits for redress in its own courts." *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 391; *Mississippi Mills* v. *Cohn*, 150 U. S. 202, 204; *Cowles* v. *Mercer Co.*, 7 Wall. 118; *Lincoln County* v. *Luning*, 133 U. S. 529; *Scott* v. *Neely*, 140 U. S. 106; *Chicot County* v. *Sherwood*, 148 U. S. 529; *Cates* v. *Allen*, 149 U. S. 451.

In these cases the plaintiffs, stockholders in the corporations named, ask a decree enjoining the enforcement of certain rates for transportation upon the ground that the statute prescribing them is repugnant to the Constitution of the United States. Under the principles which in the Federal system distinguish cases in law from those in equity, the Circuit Court of the United States, sitting in equity, can make a comprehensive decree covering the whole ground of controversy and thus avoid the multiplicity of suits that would inevitably arise under the statute. The carrier is made liable not only to individual persons for every act, matter or thing prohibited by the statute, and for every omission to do any act, matter or thing required to be done, but to a fine of from one thousand to five thousand dollars for the first offence, from five thousand to ten thousand dollars for the second offence, from ten thousand to twenty thousand dollars for the third offence, and twenty-five thousand dollars for every subsequent offence. The transactions along the line of any one of these railroads, out of which causes of action might arise under the statute, are so numerous and varied that the interference of equity could well be justified upon the ground that a general decree, according to the prayer of the bills, would avoid a multiplicity

of suits, and give a remedy more certain and efficacious than could be given in any proceeding instituted against the company in a court of law; for a court of law could only deal with each separate transaction involving the rates to be charged for transportation. The transactions of a single week would expose any company questioning the validity of the statute to a vast number of suits by shippers, to say nothing of the heavy penalties named in the statute. Only a court of equity is competent to meet such an emergency and determine, once for all and without a multiplicity of suits, matters that affect not simply individuals, but the interests of the entire community as involved in the use of a public highway and in the administration of the affairs of the quasi-public corporation by which such highway is maintained.

Another question of a preliminary character must be here noticed. The answer of the officers of the State in each case insists that the real party in interest is the State, and that these suits are, in effect, suits against the State, of which the Circuit Court of the United States cannot take jurisdiction consistently with the Eleventh Amendment of the Constitution of the United States. This point is, perhaps, covered by the general assignments of error, but it was not discussed at the bar by the representatives of the State Board. It would therefore be sufficient to say that these are cases of which, so far as the plaintiffs are concerned, the Circuit Court has jurisdiction not only upon the ground of the diverse citizenship or alienage of the parties, but upon the further ground that, as the statute of Nebraska under which the State Board of Transportation proceeds is assailed as being repugnant to rights secured to the plaintiffs by the Constitution of the United States, the cases may be regarded as arising under that instrument. But to prevent misapprehension, we add that, within the meaning of the Eleventh Amendment of the Constitution, the suits are not against the State but against certain individuals charged with the administration of a state enactment, which, it is alleged, cannot be enforced without violating the constitutional rights of the plaintiffs. It is the settled doctrine of this court that a suit against individuals for

the purpose of preventing them as officers of a State from enforcing an unconstitutional enactment to the injury of the rights of the plaintiff, is not a suit against the State within the meaning of that Amendment. *Pennoyer* v. *McConnaughy*, 140 U. S. 1, 10; *In re Tyler*, 149 U. S. 164, 190; *Scott* v. *Donald*, 165 U. S. 58, 68; *Tindal* v. *Wesley*, 167 U. S. 204, 220.

An important question is presented that relates only to the Union Pacific Company. That company is a corporation formed by the consolidation of several companies under the authority of acts of Congress, one of the constituent companies being the Union Pacific Railroad Company incorporated by the act of July 1, 1862, c. 120, 12 Stat. 489. *United States* v. *Union Pacific Railway*, 160 U. S. 1, 6. Neither that company nor the Union Pacific Railroad Company is named in the Nebraska statute, but the statute is interpreted by the State Board of Transportation as embracing the present defendant corporation. It is contended that the State is without power to fix or limit the rates that the Union Pacific Company may charge for the transportation of freight on its lines between points within Nebraska. This contention rests: 1. Upon the provisions of the acts of Congress showing that the Union Pacific Railroad Company was created for the accomplishment of national objects, namely, to secure the safe and speedy transportation of the mails, troops, munitions of war and public stores of the United States; 2. Upon the eighteenth section of the above act of July 1, 1862, 12 Stat. 489, 497, c. 120, providing that " whenever it appears that the net earnings of the entire road and telegraph, including the amount allowed for services rendered for the United States, after deducting all expenditures, including repairs and the furnishing, running and managing of said road, shall exceed ten per centum upon its cost, exclusive of the five per centum to be paid to the United States, Congress may reduce the rates of fare thereon, if unreasonable in amount, and may fix and establish the same by law." The argument is that Congress by this enactment has reserved to itself exclusive control of rates, interstate and local, to be charged on the Union Pacific Railroad. As this view, if maintained, would require

an affirmance of the decree so far as the Union Pacific Company is concerned, whether the Nebraska statute of 1893 be constitutional or not as to the other railroad corporations, it cannot properly be passed without examination.

In *Reagan* v. *Mercantile Trust Co.*, 154 U. S. 413, 416, the question arose whether the Texas and Pacific Railway Company, a corporation organized under the laws of the United States, was subject to the laws of Texas with respect to rates for transportation wholly within that State. The ground upon which exemption from state control was there asserted by the company was that it received all its franchises from Congress, including the franchise to charge and collect tolls. This court, conceding, for the purposes of that case, that Congress had power to remove the corporation in all its operations from state control, held that the act creating it did not show an intention upon the part of Congress to exempt it from the duty to conform to such reasonable rates for local transportation as the State might prescribe, and that the enforcement by the State of reasonable rates for such transportation would not disable the corporation from performing the duties and exercising the powers imposed upon it by Congress. The court said: "By the act of incorporation Congress authorized the company to build its road through the State of Texas. It knew that, when constructed, a part of its business would be the carrying of persons and property from points within the State to other points also within the State, and that in so doing it would be engaged in a business, control of which is nowhere by the Federal Constitution given to Congress. It must have been known that, in the nature of things, the control of that business would be exercised by the State, and if it deemed that the interests of the nation and the discharge of the duties required on behalf of the nation from this corporation demanded exemption in all things from state control, it would unquestionably have expressed such intention in language whose meaning would be clear. Its silence in this respect is satisfactory assurance that, in so far as this corporation should engage in business wholly within the State, it intended that it should be subjected to the ordinary control

exercised by the State over such business. Without, therefore, relying at all upon any acceptance by the railroad corporation of the act of the legislature of the State, passed in 1873 in respect to it, we are of opinion that the Texas and Pacific Railway Company is, as to business done wholly within the State, subject to the control of the State in all matters of taxation, rates and other police regulations."

This conclusion, as may be observed from the opinion, was based in part upon the reasoning in *Thomson* v. *Pacific Railroad*, 9 Wall. 579, and in *Railroad Company* v. *Peniston*, 18 Wall. 5, in which cases it was held that the property of certain railroad companies was not exempt from state taxation by reason alone of the fact that they were organized under acts of Congress for the accomplishment of national objects, and that the imposition of such taxes was not, in a constitutional sense, an obstruction to the exercise of the powers of the General Government, nor an interference with the discharge of the duties required of the companies by their charters.

In the present case the question is more difficult of solution by reason of the declaration in the above act of July 1, 1862 (no similar declaration being made in the act incorporating the Texas and Pacific Railway Company), that Congress may reduce the rates of fare on the Union Pacific Railroad if unreasonable in amount, and may fix and establish the same by law whenever the net earnings of the entire road and telegraph, ascertained upon a named basis, should exceed ten per centum upon its cost, exclusive of the five per centum to be paid to the United States.

Undoubtedly Congress intended by that act to reserve such power as was necessary to prevent the corporation from exacting rates that were unreasonable. But this is not equivalent to a declaration that the States through which the railroad might be constructed should not regulate rates for transportation begun and completed within their respective limits.

It cannot be doubted that the making of rates for transportation by railroad corporations along public highways,

between points wholly within the limits of a State, is a subject primarily within the control of that State. And it ought not to be supposed that Congress intended that, so long as it forbore to establish rates on the Union Pacific Railroad, the corporation itself could fix such rates for transportation as it saw proper independently of the right of the States through which the road was constructed to prescribe regulations for transportation beginning and ending within their respective limits. On the contrary, the better interpretation of the act of July 1, 1862, is that the question of rates for wholly local business was left under the control of the respective States through which the Union Pacific Railroad might pass, with power reserved to Congress to intervene under certain circumstances and fix the rates that the corporation could reasonably charge and collect. Congress not having exerted this power, we do not think that the national character of the corporation constructing the Union Pacific Railroad stands in the way of a State prescribing rates for transporting property on that road wholly between points within its territory. Until Congress, in the exercise either of the power specifically reserved by the eighteenth section of the act of 1862 or its power under the general reservation made of authority to add to, alter, amend or repeal that act, prescribes rates to be charged by the railroad company, it remains with the States through which the road passes to fix rates for transportation beginning and ending within their respective limits.

We are now to inquire whether the Nebraska statute is repugnant to the Constitution of the United States.

By the Fourteenth Amendment it is provided that no State shall deprive any person of property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws. That corporations are persons within the meaning of this Amendment is now settled. *Santa Clara County* v. *Southern Pacific Railroad*, 118 U. S. 394, 396; *Charlotte, Columbia & Augusta Railroad* v. *Gibbes*, 142 U. S. 386, 391; *Gulf, Colorado & Santa Fé Railway* v. *Ellis*, 165 U. S. 150, 154. What amounts to deprivation of property without due process of law or what is a denial of the equal

protection of the laws is often difficult to determine, especially where the question relates to the property of a *quasi* public corporation and the extent to which it may be subjected to public control. But this court, speaking by Chief Justice Waite, has said that, while a State has power to fix the charges by railroad companies for the transportation of persons and property within its own jurisdiction, unless restrained by valid contract, or unless what is done amounts to a regulation of foreign or interstate commerce, such power is not without limit; and that, "under pretence of regulating fares and freights, the State cannot require a railroad corporation to carry persons or property without reward, neither can it do that which in law amounts to the taking of private property for public use without just compensation, or without due process of law." *Railroad Commission Cases*, 116 U. S. 307, 325, 331. This principle was recognized in *Dow* v. *Beidelman*, 125 U. S. 680, 689, and has been reaffirmed in other cases. In *Georgia Railroad & Banking Co.* v. *Smith*, 128 U. S. 174, 179, it was said that the power of the State to prescribe the charges of a railroad company for the carriage of persons and merchandise within its limits — in the absence of any provision in the charter of the company constituting a contract vesting it with authority over those matters — was "subject to the limitation that the carriage is not required without reward, or upon conditions amounting to the taking of property for public use without just compensation; and that what is done does not amount to a regulation of foreign or interstate commerce." In *Chicago, Milwaukee & St. Paul Railway* v. *Minnesota*, 134 U. S. 418, 458, it was said: "If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus, in substance and effect, of the property itself, without due process of law and in violation of the Constitution of the United States; and in so far as it is thus deprived, while other persons are permitted to receive reasonable profits upon their invested capital, the company is deprived of the equal protec-

tion of the laws." In *Chicago & Grand Trunk Railway* v. *Wellman*, 143 U. S. 339, 344, the court, in answer to the suggestion that the legislature had no authority to prescribe maximum rates for railroad transportation, said that "the legislature has power to fix rates, and the extent of judicial interference is protection against unreasonable rates." In *Budd* v. *New York*, 143 U. S. 517, 547, the court, while sustaining the power of New York by statute to regulate charges to be exacted at grain elevators and warehouses in that State, took care to state, as a result of former decisions, that such power was not one "to destroy or a power to compel the doing of the services without reward, or to take private property for public use without just compensation or without due process of law."

In *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 399, which involved the validity of certain rates for freights and passengers prescribed by a railroad commission established by an act of the legislature of Texas, this court, after referring to the above cases, said: "These cases all support the proposition that while it is not the province of the courts to enter upon the merely administrative duty of framing a tariff of rates for carriage, it is within the scope of judicial power and a part of judicial duty to restrain anything which, in the form of a regulation of rates, operates to deny to the owners of property invested in the business of transportation that equal protection which is the constitutional right of all owners of other property. There is nothing new or strange in this. It has always been a part of the judicial function to determine whether the act of one party (whether that party be a single individual, an organized body or the public as a whole) operates to divest the other party of any rights of person or property. In every constitution is the guarantee against the taking of private property for public purposes without just compensation. The equal protection of the laws which, by the Fourteenth Amendment, no State can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another, or of the

public. This, as has been often observed, is a government of law, and not a government of men, and it must never be forgotten that under such a government, with its constitutional limitations and guarantees, the forms of law and the machinery of government, with all their reach and power, must in their actual workings stop on the hither side of the unnecessary and uncompensated taking or destruction of any private property, legally acquired and legally held. It was, therefore, within the competency of the Circuit Court of the United States for the Western District of Texas, at the instance of the plaintiff, a citizen of another State, to enter upon an inquiry as to the reasonableness and justice of the rates prescribed by the railroad commission. Indeed, it was in so doing only exercising a power expressly named in the act creating the commission."

So, in *St. Louis & San Francisco Railway* v. *Gill*, 156 U. S. 649, 657, it was said that "there is a remedy in the courts for relief against legislation establishing a tariff of rates which is so unreasonable as to practically destroy the value of property of companies engaged in the carrying business, and that especially may the courts of the United States treat such a question as a judicial one, and hold such acts of legislation to be in conflict with the Constitution of the United States, as depriving the companies of their property without due process of law, and as depriving them of the equal protection of the laws." In *Covington & Lexington Turnpike Road Co.* v. *Sandford*, 164 U. S. 578, 584, 594–5, 597, which involved the validity of a state enactment prescribing rates of toll on a turnpike road, the court said : "A statute which, by its necessary operation, compels a turnpike company, when charging only such tolls as are just to the public, to submit to such further reduction of rates as will prevent it from keeping its road in proper repair, and from earning any dividends whatever for stockholders, is as obnoxious to the Constitution of the United States as would be a similar statute relating to the business of a railroad corporation having authority, under its charter, to collect and receive tolls for passengers and freight." And in *Chicago, Burlington & Quincy Railroad* v. *Chicago*,

166 U. S. 226, 241, it was held that "a judgment of a state court, even if it be authorized by statute, whereby private property is taken for the State or under its direction for public use, without compensation made or secured to the owner, is, upon principle and authority wanting in the due process of law required by the Fourteenth Amendment of the Constitution of the United States, and the affirmance of such judgment by the highest court of the State is a denial by that State of a right secured to the owner by that instrument."

In view of the adjudications these principles must be regarded as settled:

1. A railroad corporation is a person within the meaning of the Fourteenth Amendment declaring that no State shall deprive any person of property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

2. A state enactment, or regulations made under the authority of a state enactment, establishing rates for the transportation of persons or property by railroad that will not admit of the carrier earning such compensation as under all the circumstances is just to it and to the public, would deprive such carrier of its property without due process of law and deny to it the equal protection of the laws, and would therefore be repugnant to the Fourteenth Amendment of the Constitution of the United States.

3. While rates for the transportation of persons and property within the limits of a State are primarily for its determination, the question whether they are so unreasonably low as to deprive the carrier of its property without such compensation as the Constitution secures, and therefore without due process of law, cannot be so conclusively determined by the legislature of the State or by regulations adopted under its authority, that the matter may not become the subject of judicial inquiry.

The cases before us directly present the important question last stated.

Before entering upon its examination, it may be observed that the grant to the legislature in the constitution of Ne-

braska of the power to establish maximum rates for the transportation of passengers and freight on railroads in that State has reference to "reasonable" maximum rates. These words strongly imply that it was not intended to give a power to fix maximum rates without regard to their reasonableness. Be this as it may, it cannot be admitted that the power granted may be exerted in derogation of rights secured by the Constitution of the United States, or that the judiciary may not, when its jurisdiction is properly invoked, protect those rights.

What are the considerations to which weight must be given when we seek to ascertain the compensation that a railroad company is entitled to receive, and a prohibition upon the receiving of which may be fairly deemed a deprivation by legislative decree of property without due process of law? Undoubtedly that question could be more easily determined by a commission composed of persons whose special skill, observation and experience qualifies them to so handle great problems of transportation as to do justice both to the public and to those whose money has been used to construct and maintain highways for the convenience and benefit of the people. But despite the difficulties that confessedly attend the proper solution of such questions, the court cannot shrink from the duty to determine whether it be true, as alleged, that the Nebraska statute invades or destroys rights secured by the supreme law of the land. No one, we take it, will contend that a state enactment is in harmony with that law simply because the legislature of the State has declared such to be the case; for that would make the state legislature the final judge of the validity of its enactment, although the Constitution of the United States and the laws made in pursuance thereof are the supreme law of the land, anything in the constitution or laws of any State to the contrary notwithstanding. Art. VI. The idea that any legislature, state or Federal, can conclusively determine for the people and for the courts that what it enacts in the form of law, or what it authorizes its agents to do, is consistent with the fundamental law, is in opposition to the theory of our institutions. The duty rests upon all courts, Federal and state, when their

jurisdiction is properly invoked, to see to it that no right se-
cured by the supreme law of the land is impaired or destroyed
by legislation.   This function and duty of the judiciary distin-
guishes the American system from all other systems of govern-
ment.   The perpetuity of our institutions and the liberty which
is enjoyed under them depend, in no small degree, upon the
power given the judiciary to declare null and void all legisla-
tion that is clearly repugnant to the supreme law of the land.

We turn now to the evidence in the voluminous record before
us for the purpose of ascertaining whether — looking at the
cases in the light of the facts as they existed when the decrees
were rendered — the Nebraska statute, if enforced, would, by
its necessary operation, have deprived the companies, whose
stockholders and bondholders here complain, of the right to
obtain just compensation for the services rendered by them.

The first and most important contention of the plaintiffs is
that, if the statute had been in force during any one of the
three years preceding its passage, the defendant companies
would have been compelled to use their property for the
public substantially without reward or without the just com-
pensation to which it was entitled.   We think this mode of
calculation for ascertaining the probable effect of the Nebraska
statute upon the railroad companies in question is one that may
be properly used.

The conclusion reached by the Circuit Court was that the
reduction made by the Nebraska statute in the rates for local
freight was so unjust and unreasonable as to require a decree
staying the enforcement of such rates against the companies
named in the bill.   *Ames* v. *Union Pacific Railway*, 64 Fed.
Rep. 165, 189.   That conclusion was based largely upon the
figures presented by Mr. Dilworth, while he was a secretary
of the State Board of Transportation, as well as a defendant
and one of the solicitors of the defendants in these causes.
He was a principal witness for that Board.   His general fair-
ness and his competency to speak of the facts upon which the
question before us depends are apparent on the record.   He
stated that the average reduction made by the statute on all
the "commodities of local rates" was 29.50 per cent; and this

estimate seems to have been accepted by the parties as correct. He estimated that the percentage of operating expenses on local business would exceed the percentage of operating expenses on all business by at least ten per cent, and that it might go as high as twenty per cent or higher. And this view is more than sustained by the evidence of witnesses possessing special knowledge of railroad transportation and of the cost of doing local business as compared with what is called through business. Indeed, one of those witnesses states that the cost of carrying local freight is four times as much as the cost of through freight per ton per mile; another, that the cost of the short haul is "reasonably double the long haul." If due regard be had to the testimony — and we have no other basis for our judgment — we are not permitted to place the extra cost of local business at less than ten per cent greater than the percentage of the cost of all business.

In answer to questions propounded to him by the defendants constituting the State Board of Transportation, Mr. Dilworth stated that he had prepared himself with an estimate showing the number of tons of freight, commonly spoken of as local freight, hauled on the respective railways in Nebraska, and the amount received by the railway companies by way of tariff on tons of freight hauled, including through as well as local freight, and was qualified to speak as to the amount received by the companies for both passengers and freight within the State, and the reduction that would take place in rates under the statute in question. He presented various tables showing the results of his investigations. One is known as Exhibit 4, and is an "Estimate of local business, and the effect of House Roll 33" on the Burlington, St. Paul, Fremont, Union Pacific, Omaha, St. Joseph and Kansas City Companies for the year 1892. Another is called Exhibit 19, and is a like estimate in respect of the same companies for the years 1891 and 1893. Another is known as Exhibit 20, and shows "Tons carried, tonnage per mile and percentage of expenses for the years ending June 30, 1891, 1892 and 1893 (Nebraska)." These exhibits are as follows:

**Exhibit "4."**

*Estimate of Local Business and the Effect of House Roll 33 on the Following-named Railroads:*

| 1892. | Number of tons hauled locally. | Average amount received for each ton hauled. | Total amount received for tons hauled locally. | Total amount of reduction caused by H. R. 33. | Amount received from passenger business. | Amount received for freight hauled in Nebraska including through and local. | Total amount realized on all business done in the State. | Per cent of reduction on all business done in the State by H. R. 33. |
|---|---|---|---|---|---|---|---|---|
| Burlington Co. | 574,653 | $2.15416 | $1,237,884 | $365,175 | $2,369,714 | $5,588,766 | $7,908,242 | .044 |
| St. Paul Co. | 65,762 | 1.87089 | 123,033 | 36,294 | 263,458 | 472,051 | 763,509 | .047 |
| Fremont Co. | 158,350 | 2.12633 | 336,714 | 99,310 | 598,219 | 1,495,468 | 2,093,687 | .047 |
| Union Pacific Co. | 192,865 | 2.06498 | 398,262 | 117,487 | 977,264 | 4,284,793 | 5,262,057 | .022 |
| Omaha Co. | 63,999 | 1.38026 | 88,335 | 26,043 | 305,668 | 955,626 | 1,261,294 | .022 |
| St. Joseph Co. | 39,657 | .63051 | 31,004 | 8,836 | 71,083 | 216,395 | 287,478 | .030 |
| Kansas City Co. | 10,823 | .61261 | 6,630 | 1,889 | 41,123 | 125,530 | 166,653 | .011 |

Opinion of the Court.

Exhibit "19."

*Estimate of Local Business and the Effect of House Roll 33 on the Following-named Railroads for the Years ending June 30, 1891 and 1893.*

| | Number of tons hauled locally. | Average amount received per each ton hauled. | Total amount received per ton [for tons] carried locally. | Total amount of reduction caused by H. R. 33. | Amount received from passenger business. | Amount received from freight carried in Nebraska including local and through. | Total amount received on all business done in the State. | Per cent of reduction on all business done in the State by H. R. 33. |
|---|---|---|---|---|---|---|---|---|
| **1891.** | | | | | | | | |
| Burlington Co. | 538,824 | $1.98 | $1,066,871 | $314,726 | $2,321,983 | $3,942,078 | $6,264,061 | .05 |
| St. Paul Co. | 64,496 | 1.72 | 110,933 | 37,725 | 225,264 | 506,470 | 731,734 | .044 |
| Fremont Co. | 141,056 | 2.47 | 348,408 | 102,780 | 876,583 | 1,969,242 | 2,845,825 | .036 |
| Union Pacific Co. | 152,028 | 1.83 | 278,211 | 82,072 | 1,509,331 | 3,791,849 | 5,301,108 | .015 |
| Omaha Co. | 61,448 | 1.23 | 75,581 | 22,296 | 311,130 | 580,834 | 891,964 | .025 |
| St. Joseph Co. | 25,078 | .87 | 21,817 | 6,245 | 86,036 | 178,529 | 264,565 | .024 |
| Kansas City Co. | 8,743 | .77 | 6,732 | 1,985 | 41,837 | 67,946 | 109,783 | .018 |
| **1893.** | | | | | | | | |
| Burlington Co. | 583,294 | 2.13 | 1,242,416 | 366,512 | 2,581,564 | 5,973,356 | 8,554,020 | .042 |
| St. Paul Co. | 78,753 | 1.81 | 142,542 | 42,049 | 267,535 | 650,109 | 917,644 | .045 |
| Fremont Co. | 177,804 | 2.26 | 424,437 | 125,208 | 816,239 | 2,237,044 | 3,053,283 | .041 |
| Union Pacific Co. | 220,061 | 1.88 | 413,714 | 122,045 | 1,551,877 | 4,313,204 | 5,865,081 | .020 |
| Omaha Co. | 68,237 | 1.18 | 80,519 | 23,753 | 332,497 | 887,616 | 1,220,113 | .019 |
| St. Joseph Co. | 50,452 | .67 | 33,802 | 9,971 | 99,306 | 263,516 | 362,912 | .027 |
| Kansas City Co. | 15,485 | .61 | 9,445 | 2,786 | 41,667 | 135,824 | 177,491 | .015 |

Exhibit "20."

Tons carried, Tonnage per Mile and Percentage of Expenses for Years ending June 30, 1891, 1892 and 1893 (Nebraska).

| NAME OF ROAD. | Number of tons carried locally. | Number of tons of inter-state freight carried. | Number of tons of local freight carried 1 mile. | Number of tons of interstate freight carried 1 mile. | Total number of tons, local and interstate, carried 1 mile. | Total number of passengers, local and inter-state, carried 1 mile. | Percentage of expenses to earnings. |
|---|---|---|---|---|---|---|---|
| **1891.** | | | | | | | |
| Burlington Co. | 538,824 | 1,448,229 | 73,075,310 | 106,415,962 | 269,491,272 | 69,594,747 | 66.24 |
| St. Paul Co. | 64,496 | 228,671 | 10,267,118 | 36,397,029 | 46,064,747 | 7,403,263 | 70.78 |
| Fremont Co. | 141,056 | 654,400 | 21,803,680 | 101,644,999 | 123,508,679 | 24,808,729 | 49.87 |
| Union Pacific Co. | 152,028 | 1,908,045 | 28,908,124 | 362,966,694 | 391,874,818 | 66,072,597 | 68.94 |
| Omaha Co. | 61,448 | 409,270 | 4,579,104 | 30,499,041 | 35,078,145 | 10,295,137 | 120.20 |
| St. Joseph Co. | 25,078 | 178,169 | 1,497,658 | 10,640,979 | 12,138,637 | 2,308,918 | 96.44 |
| Kansas City Co. | 8,743 | 78,694 | 403,751 | 3,634,082 | 4,037,833 | 912,210 | 99.54 |
| **1892.** | | | | | | | |
| Burlington Co. | 574,655 | 1,990,437 | 91,139,965 | 316,552,193 | 407,692,158 | 70,038,243 | 64.23 |
| St. Paul Co. | 65,762 | 264,403 | 11,028,287 | 44,321,384 | 55,349,671 | 8,833,405 | 65.96 |
| Fremont Co. | 158,350 | 846,312 | 24,069,200 | 128,425,903 | 152,495,103 | 21,874,987 | 70.71 |
| Union Pacific Co. | 192,865 | 1,882,112 | 42,970,322 | 419,300,773 | 462,271,095 | 50,926,269 | 56.44 |
| Omaha Co. | 63,999 | 628,351 | 4,050,127 | 45,745,647 | 50,404,774 | 10,058,442 | 93.12 |
| St. Joseph Co. | 39,657 | 303,550 | 2,005,851 | 15,355,015 | 17,360,866 | 2,472,538 | 74.23 |
| Kansas City Co. | 10,823 | 194,089 | 481,515 | 8,635,016 | 9,116,531 | 864,030 | 75.19 |
| **1893.** | | | | | | | |
| Burlington Co. | 583,294 | 2,221,005 | 93,703,675 | 357,131,753 | 450,925,428 | 83,091,418 | 65.51 |
| St. Paul Co. | 78,753 | 279,218 | 12,848,551 | 45,554,417 | 58,402,968 | 9,074,093 | 64.58 |
| Fremont Co. | 187,804 | 800,158 | 26,855,972 | 114,511,328 | 141,367,300 | 28,209,212 | 53.66 |
| Union Pacific Co. | 220,061 | 2,068,568 | 45,948,736 | 431,949,561 | 477,898,297 | 63,422,117 | 58.51 |
| Omaha Co. | 68,237 | 683,868 | 4,257,988 | 42,706,297 | 46,964,285 | 11,028,131 | 94.14 |
| St. Joseph Co. | 50,452 | 337,647 | 2,774,860 | 18,576,845 | 21,351,705 | 2,834,169 | 62.05 |
| Kansas City Co. | 15,484 | 205,725 | 658,534 | 8,750,126 | 9,408,660 | 875,415 | 76.50 |

It may be here stated that the words in these exhibits, "number of tons hauled locally," refer to freight that started and ended in the State; the words in Exhibit 4, "amount received for freight hauled in Nebraska, including through and local," and the like words in Exhibit 19, refer not only to freight starting and ending in the State, but to all freight hauled by the railroad company in Nebraska, regardless of its destination or origin — that is, "freight that begins in the State and goes out of the State, freight that begins out of the State and comes into the State and freight which begins and ends in the State." The words, "per cent of reduction on all the business done in the State by House Roll 33," in Exhibits 4 and 19, mean the percentage of the total amount of all business, passenger and freight, done in the State, whatever its origin or destination, and do not indicate the percentage of reduction on local business when considered alone. It should be stated also that the words, "percentage of expenses to earnings," in Exhibit 20, refer to all business, through and local, done by the railroad company within the State. Mr. Dilworth, as we have seen, testified that if the local business alone were considered, the percentage of expenses to earnings upon such business would be at least ten per cent more than the general percentage of expenses to earnings on all business, both through and local. It is important here to note that his estimates are of business from July 1st to the succeeding June 30th. So that when allusion is made presently to his estimates for 1891, 1892 and 1893, it will be understood to refer to the years *ending* the 30th days of June, 1891, 1892 and 1893, respectively.

From July 1, 1890, to June 30, 1891, as shown by Exhibit 20, the percentage of expenses to earnings on all business on the Burlington road was 66.24; on the St. Paul road, 70.78; on the Fremont road, 49.87; on the Union Pacific road, 68.94; on the Omaha road, 120.26; on the St. Joseph road, 96.44; and on the Kansas City road, 99.54;

From July 1, 1891, to June 30, 1892, as shown by the same Exhibit, the percentage of expenses to earnings on all business on the Burlington road was 64.23; on the St. Paul

road, 65.96; on the Fremont road, 70.71; on the Union Pacific road, 56.44; on the Omaha road, 93.12; on the St. Joseph road, 74.23; and on the Kansas City road, 75.19; and,

From July 1, 1892, to June 30, 1893, as shown by the same Exhibit, the percentage of expenses to earnings on all business on the Burlington road was 65.51; on the St. Paul road, 64.58; on the Fremont road, 53.66; on the Union Pacific road, 58.51; on the Omaha road, 94.14; on the St. Joseph road, 62.05; and on the Kansas City road, 76.50.

In view of the reduction of 29.50 in rates prescribed by the statute and of the extra cost of doing local business, as compared with other business, what do these facts show?

Take the case of the Burlington road from July 1, 1890, to June 30, 1891. Looking at the entire business done on it during that period within the limits of the State, we find that the percentage of operating expenses to earnings on all business — which, as stated, does not include the extra cost of local business — was 66.24. Add to this the extra cost of local business, estimated at at least ten per cent, and the result is that, under the rates charged during the period stated, the cost to the Burlington Company of earning $100 would have been $76.24. Now, if the reduction of 29½ per cent made by the act of 1893 had been in force prior to July 1, 1891, the company would have received $70.50 as against $100 for the same service, showing that in that year the operating expenses would have exceeded the earnings by $5.74 in every $100 of the amount actually received by it.

By like calculations, it will appear that each of the railroad companies would have conducted its local business at a loss during the periods stated, except that in the year ending June 30, 1891, and in the year ending June 30, 1893, the earnings of the Fremont Company, and in the years ending the 30th days of June, 1892 and 1893, respectively, the earnings of the Union Pacific Company, would have slightly exceeded their operating expenses.

Under the rates prescribed by the act of 1893 the cost to the respective companies of local business in Nebraska would have exceeded the earnings for the years ending June 30,

1891, 1892 and 1893, respectively, in every one hundred dollars of the amount actually received, as follows : To the Burlington Company, by $5.74, $3.73 and $5.01; to the St. Paul Company, by $10.28, $5.46 and $4.08; to the Omaha Company, by $59.76, $32.62 and $33.64; to the St. Joseph Company, by $35.94, $13.73 and $1.55 ; and to the Kansas City Company, by $39.04, $14.69 and $16. The cost to the Union Pacific Company for the year ending June 30, 1891, of its local business, under the rates prescribed by the statute of 1893, would have caused a loss of $8.44 in every one hundred dollars of the amount actually received.

In order to show these results at a glance, the table on page 536 is inserted upon the basis of one hundred as representing the amounts actually charged and received by the respective railroad companies for the years given.

There are other views of the case suggested by the above exhibits and table which show the same results.

In the year ending June 30, 1891, under the rates then in force, the Burlington Company received $1,066,871 for tons carried locally. If the business had been done under the rates prescribed by the act of 1893, it would have received $29\frac{1}{2}$ per cent less, that is, only $752,145 or $314,726 less than it did receive. The percentage of expenses to earnings, including the extra cost of local business, was 76.24; that is, it cost $813,382 to earn $1,066,871. So that the difference between $813,382 and $752,145 shows that, if the rates prescribed by the statute of 1893 had been in force during the year ending June 30, 1891, the amount received would have been less than the operating expenses of the Burlington Company by $61,237.

During the year ending June 30, 1892, the same company received for tons carried locally $1,237,884. If the act of 1893 had been in force, it would have received, because of the reduced rates prescribed by that act, only $872,709 — less by $365,175 than it did receive. The percentage of expenses to earnings, including the extra cost of local business, was 74.23 ; that is, the $872,709 would have been earned at a cost of $918,881. So that under the rates prescribed by the act

| NAME. | Cost by percentage of all business. | Extra cost of local business. | Total cost of local business. | Earnings as reduced by act of 1893. | Loss. | Gain. |
|---|---|---|---|---|---|---|
| **1891.** | | | | | | |
| Burlington Company . | 66.24 | 10 | 76.24 | 70.50 | 5.74 | |
| St. Paul Company . . | 70.78 | 10 | 80.78 | 70.50 | 10.28 | |
| Fremont Company . . | 49.87 | 10 | 59.87 | 70.50 | . . . | 10.63 |
| Union Pacific Company. | 68.94 | 10 | 78.94 | 70.50 | 8.44 | |
| Omaha Company . . . | 120.26 | 10 | 130.26 | 70.50 | 59.76 | |
| St. Joseph Company . | 96.44 | 10 | 106.44 | 70.50 | 35.94 | |
| Kansas City Company . | 99.54 | 10 | 109.54 | 70.50 | 39.04 | |
| **1892.** | | | | | | |
| Burlington Company . | 64.23 | 10 | 74.23 | 70.50 | 3.73 | |
| St. Paul Company . . | 65.96 | 10 | 75.96 | 70.50 | 5.46 | |
| Fremont Company . . | 70.71 | 10 | 80.71 | 70.50 | 10.21 | |
| Union Pacific Company. | 56.44 | 10 | 66.44 | 70.50 | . . . | 4.06 |
| Omaha Company . . . | 93.12 | 10 | 103.12 | 70.50 | 32.62 | |
| St. Joseph Company . | 74.23 | 10 | 84.23 | 70.50 | 13.73 | |
| Kansas City Company . | 75.19 | 10 | 85.19 | 70.50 | 14.69 | |
| **1893.** | | | | | | |
| Burlington Company . | 65.51 | 10 | 75.51 | 70.50 | 5.01 | |
| St. Paul Company . . | 64.58 | 10 | 74.58 | 70.50 | 4.08 | |
| Fremont Company . . | 53.66 | 10 | 63.66 | 70.50 | . . . | 6.84 |
| Union Pacific Company. | 58.51 | 10 | 68.51 | 70.50 | . . . | 1.99 |
| Omaha Company . . . | 94.14 | 10 | 104.14 | 70.50 | 33.64 | |
| St. Joseph Company . | 62.05 | 10 | 72.05 | 70.50 | 1.55 | |
| Kansas City Company . | 76.50 | 10 | 86.50 | 70.50 | 16.00 | |

of 1893 the loss during the period named would have been $46,172.

During the year ending June 30, 1893, that company received $1,242,416 for tons carried locally; whereas, under the 29½ per cent reduction prescribed by the statute of that year, it would have received only $875,905, that is, less by $366,512 than it did receive. The percentage of its expenses to earnings in that year, including the extra cost of local business, was 75.51; that is, under the statutory rates $875,905 would have been earned at a cost of $938,147; which would have been a loss of $62,243.

By the same mode of calculation, it will be found that, if the statute of 1893 had been enforced during the years ending the 30th days of June, 1891, 1892 and 1893, respectively, the other companies would have lost, that is, their expenses would have exceeded their earnings during those years by the following amounts: The St. Paul Company, $11,403, $6716 and $5814; the Fremont Company, $34,377 for the year ending June 30, 1892; the Union Pacific Company, $23,480, for the year ending June 30, 1891; the Omaha Company, $45,166, $28,813 and $27,085; the St. Joseph Company, $7840, $4256 and $523; and the Kansas City Company, $2627, $974 and $1510; while the earnings of the Union Pacific Company would have exceeded its expenses for the years ending the 30th days of June, 1892 and 1893, respectively, by $16,170 and $8234; and those of the Fremont Company by $37,037 and $29,036 for the years ending the 30th days of June, 1891 and 1893, respectively.

These results will be seen in the table on page 538, based upon the above exhibits, and assuming that 10 per cent was the very lowest amount of the extra cost of business beginning and ending in the State.

Counsel for the appellants contend that the railroad companies in Nebraska derived a profit from their local tonnage of nearly 100 per cent over and above operating expenses. This contention is based upon the evidence given by William Randall, freight and ticket agent as well as auditor of the Burlington road in Nebraska, on his first examination as a witness. He then stated that the earnings of the company for the year 1892 — meaning for the year beginning January 1, 1892 — upon freight starting and ending within the State were $1,853,036.59, and that the operating expenses, including taxes, on that business were $972,183.70. These figures, counsel say, show that "there was a clear profit over operating expenses, including taxes, of nearly one hundred per cent on the local business of the Burlington Company in 1892." But counsel overlook the fact that, upon his second examination, Mr. Randall stated that his first figures were not correct; and that the operating expenses on local business in 1892 were

Opinion of the Court.

| Name of Road. | Total amount received for tons carried locally. | Total amount of reduction by act of 1893, 29½ per cent. | What would have been received under rates fixed by act of 1893. | Amount to be deducted to pay expenses (reckoned by per cent of cost of all business). | Amount to be taken out of earnings to pay 10 per cent extra cost of local business. | Total expense of local business. | Gain. | Loss. |
|---|---|---|---|---|---|---|---|---|
| **1891.** | | | | | | | | |
| Burlington Co. | $1,066,871 | $314,726 | $752,145 | $706,695 | $106,687 | $813,382 | | $61,237 |
| St. Paul Co. | 110,033 | 32,725 | 78,208 | 78,518 | 11,093 | 89,611 | | 11,403 |
| Fremont Co. | 348,408 | 102,780 | 245,628 | 173,751 | 34,840 | 208,591 | $37,037 | |
| Union Pacific Co. | 278,211 | 82,072 | 196,139 | 191,798 | 27,821 | 219,619 | | 23,480 |
| Omaha Co. | 275,581 | 22,296 | 53,285 | 90,893 | 7,558 | 98,451 | | 45,166 |
| St. Joseph Co. | 21,817 | 6,436 | 15,381 | 21,040 | 2,181 | 23,221 | | 7,840 |
| Kansas City Co. | 6,732 | 1,985 | 4,747 | 6,701 | 673 | 7,374 | | 2,627 |
| **1892.** | | | | | | | | |
| Burlington Co. | 1,237,884 | 365,175 | 872,709 | 795,093 | 123,788 | 918,881 | | 46,172 |
| St. Paul Co. | 123,033 | 36,294 | 86,739 | 81,152 | 12,303 | 93,455 | | 6,716 |
| Fremont Co. | 336,714 | 99,330 | 237,384 | 238,090 | 33,671 | 271,761 | | 34,377 |
| Union Pacific Co. | 398,262 | 117,487 | 280,775 | 224,779 | 39,826 | 264,605 | 16,170 | |
| Omaha Co. | 88,335 | 26,058 | 62,277 | 82,257 | 8,833 | 91,090 | | 28,813 |
| St. Joseph Co. | 31,004 | 9,146 | 21,858 | 23,014 | 3,100 | 26,114 | | 4,256 |
| Kansas City Co. | 6,630 | 1,955 | 4,674 | 4,985 | 663 | 5,648 | | 974 |
| **1893.** | | | | | | | | |
| Burlington Co. | 1,242,416 | 366,512 | 875,904 | 813,906 | 124,241 | 938,147 | | 62,243 |
| St. Paul Co. | 142,542 | 42,049 | 100,493 | 92,053 | 14,254 | 106,307 | | 5,814 |
| Fremont Co. | 424,437 | 125,208 | 299,229 | 227,750 | 42,443 | 270,193 | 29,086 | |
| Union Pacific Co. | 413,714 | 122,045 | 291,669 | 242,064 | 41,371 | 283,435 | 8,234 | |
| Omaha Co. | 80,519 | 23,753 | 56,766 | 75,800 | 8,051 | 83,851 | | 27,085 |
| St. Joseph Co. | 33,802 | 9,971 | 23,881 | 20,974 | 3,380 | 24,354 | | 523 |
| Kansas City Co. | 9,445 | 2,786 | 6,659 | 7,225 | 944 | 8,169 | | 1,510 |

$1,221,742.84, and not $972,183.70. This agrees with the figures given by Mr. Taylor, another auditor of the Burlington Company. Now, if the act of 1893 had been in force during 1892, the earnings in the latter year, $1,853,036.59, would have been reduced by 29½ per cent, that is, by $546,645.79, leaving $1,306,390.80 as the total receipts on local business, which, after deducting operating expenses, $1,221,742.84, would leave a profit of $84,567.97. If, as counsel for appellees contend, 10 per cent be added as the extra cost of local business, the result would show an actual loss on that business during the whole of 1892. But if that mode of calculation be not adopted, the utmost that can be said to be established by the evidence of Taylor and Randall would be that if the rates fixed by the act of 1893 had been in force during 1892, the company would have received on local business, in the latter year, $84,647.96 over and above operating expenses, or a little over 6 per cent of the amount of those expenses. The difference between the figures of Dilworth and Taylor and Randall, as to the earnings of the Burlington Company, arises, so far as we can perceive, from the fact that their calculations cover different periods. Dilworth gave the earnings from July 1, 1891, to June 30, 1892, and speaks of them as the earnings for 1892, while Taylor and Randall gave the earnings from January 1, 1892, to December 31, 1892. There may have been an unusual amount of business during the last six months of 1892 embraced in the estimates of Taylor and Randall, and not embraced by Dilworth's estimates. We cannot, therefore, say that the testimony of Taylor and Randall overthrows the estimates of Dilworth.

It is said by the appellants that the local rates established by the Nebraska statute are much higher than in the State of Iowa, and that fact shows that the Nebraska rates are reasonable. This contention was thus met by the Circuit Court: "It is, however, urged by the defendants that, in the general tariffs of these companies, there is an inequality; that the rates in Nebraska are higher than those in adjoining States, and that the reduction by House Roll 33 simply establishes an equality between Nebraska and the other States through

which the roads run. The question is asked, Are not the people of Nebraska entitled to as cheap rates as the people of Iowa? Of course, relatively they are. That is, the roads may not discriminate against the people of any one State, but they are not necessarily bound to give absolutely the same rates to the people of all the States; for the kind and amount of business and the cost thereof are factors which determine largely the question of rates, and these vary in the several States. The volume of business in one State may be greater per mile, while the cost of construction and of maintenance is less. Hence, to enforce the same rates in both States might result in one in great injustice, while in the other it would only be reasonable and fair. Comparisons, therefore, between the rates of two States are of little value, unless all the elements that enter into the problem are presented. It may be true, as testified by some of the witnesses, that the existing local rates in Nebraska are 40 per cent higher than similar rates in the State of Iowa. But it is also true that the mileage earnings in Iowa are greater than in Nebraska. In Iowa there are 230 people to each mile of railroad, while in Nebraska there are but 190; and, as a general rule, the more people there are the more business there is. Hence, a mere difference between the rates in two States is of comparatively little significance." 64 Fed. Rep. 165. In these views we concur, and it is unnecessary to add anything to what was said by the Circuit Court on this point.

It is further said, in behalf of the appellants, that the reasonableness of the rates established by the Nebraska statute is not to be determined by the inquiry whether such rates would leave a reasonable net profit from the local business affected thereby, but that the court should take into consideration, among other things, the whole business of the company, that is, all its business, passenger and freight, interstate and domestic. If it be found upon investigation that the profits derived by a railroad company from its interstate business alone are sufficient to cover operating expenses on its entire line, and also to meet interest, and justify a liberal dividend upon its stock, may the legislature prescribe rates for domestic

business that would bring no reward and be less than the services rendered are reasonably worth? Or, must the rates for such transportation as begins and ends in the State be established with reference solely to the amount of business done by the carrier wholly within such State, to the cost of doing such local business, and to the fair value of the property used in conducting it, without taking into consideration the amount and cost of its interstate business, and the value of the property employed in it? If we do not misapprehend counsel, their argument leads to the conclusion that the State of Nebraska could legally require local freight business to be conducted even at an actual loss, if the company earned on its interstate business enough to give it just compensation in respect of its entire line and all its business, interstate and domestic. We cannot concur in this view. In our judgment, it must be held that the reasonableness or unreasonableness of rates prescribed by a State for the transportation of persons and property wholly within its limits must be determined without reference to the interstate business done by the carrier, or to the profits derived from it. The State cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the State has no control. Nor can the carrier justify unreasonably high rates on domestic business upon the ground that it will be able only in that way to meet losses on its interstate business. So far as rates of transportation are concerned, domestic business should not be made to bear the losses on interstate business, nor the latter the losses on domestic business. It is only rates for the transportation of persons and property between points within the State that the State can prescribe; and when it undertakes to prescribe rates not to be exceeded by the carrier, it must do so with reference exclusively to what is just and reasonable, as between the carrier and the public, in respect of domestic business. The argument that a railroad line is an entirety; that its income goes into, and its expenses are provided for, out of a common fund; and that its capitalization is on its entire line, within and with-

out the State, can have no application where the State is without authority over rates on the entire line, and can only deal with local rates and make such regulations as are necessary to give just compensation on local business.

Touching the suggestion that the reduction on rates made by the state law was reasonable, if regard be had to all the business, through and local, done in the State by the railroad companies, the Circuit Court said:

"But again, as Mr. Dilworth testified, the average reduction on local rates caused by House Roll 33 is $29\frac{1}{2}$ per cent. The tariff which was in force at the time of the passage of this act had been, for some three or more years, fixed by the voluntary action of the railroad companies, and the reduction of $29\frac{1}{2}$ per cent was from their rates. It must be remembered that these roads are competing roads; that competition tends to a reduction of rates — sometimes, as the history of the country has shown, below that which affords any remuneration to those who own the property. Can it be possible that any business so carried on can suffer a reduction of $29\frac{1}{2}$ per cent in its receipts without ruin? What would any business man, engaged in any business of a private character, think of a compulsory reduction of his receipts to the amount of $29\frac{1}{2}$ per cent? The effect of this testimony is not destroyed by the table offered of the percentage of reduction on the total amount of business done by these companies in the State as follows:

"B. & M. R...................... 4.2 per cent.
"C., St. P., M. & O............... 4.5 per cent.
"F., E. &. M. B................... 4.1 per cent.
"Union Pacific................... 2.0 per cent.
"O. & R. V...................... 1.9 per cent.
"St. J. & G. I................... 2.7 per cent.
"K. C. & O...................... 1.5 per cent.

"For such a table only indicates, as is further shown by Defendants' Exhibit 4, how small a proportion of the total amount of business done in the State comes from purely local freight. Nor is it weakened by any comparison between the amount of reduction and the total receipts from all business.

It may be, as stated by counsel, that the annual earnings of the Chicago, Burlington and Quincy Company are $27,916,128, and that the total amount of reduction caused by this House Roll 33 is only $365,175. It may be that the capital stock of the company is $76,407,500, and that $365,175 distributed among the stockholders may not be for any of them a great sum; but the entire earnings of the C., B. & Q. are more than twenty times the receipts from local freight in Nebraska; and to reduce such earnings by twenty times $365,175 would make a startling difference in their amount. The fact that the State of Nebraska can reach only one twentieth of the total earnings, gives it no greater right to make a reduction in respect to that one twentieth than it would have, had it the power over the total earnings, and attempted in them a like per cent of reduction. If it would be unreasonable to reduce the total earnings of these roads 29½ per cent, it is at least, *prima facie,* equally unreasonable to so reduce any single fractional part of such earnings."

It appears, from what has been said, that if the rates prescribed by the act of 1893 had been in force during the years ending June 30, 1891, 1892 and 1893, the Fremont Company, in the years ending June 30, 1891, and June 30, 1893, and the Union Pacific Company, in the years ending June 30, 1892, and June 30, 1893, would each have received more than enough to pay operating expenses. Do those facts affect the general conclusion as to the probable effect of the act of 1893? In the discussion of this question, the plaintiffs contended that a railroad company is entitled to exact such charges for transportation as will enable it, at all times, not only to pay operating expenses, but also to meet the interest regularly accruing upon all its outstanding obligations, and justify a dividend upon all its stock; and that to prohibit it from maintaining rates or charges for transportation adequate to *all* those ends will deprive it of its property without due process of law, and deny to it the equal protection of the laws. This contention was the subject of elaborate discussion; and, as it bears upon each case in its important aspects, it should not be passed without examination.

In our opinion, the broad proposition advanced by counsel involves some misconception of the relations between the public and a railroad corporation. It is unsound in that it practically excludes from consideration the fair value of the property used, omits altogether any consideration of the right of the public to be exempt from unreasonable exactions, and makes the interests of the corporation maintaining a public highway the sole test in determining whether the rates established by or for it are such as may be rightfully prescribed as between it and the public. A railroad is a public highway, and none the less so because constructed and maintained through the agency of a corporation deriving its existence and powers from the State. Such a corporation was created for public purposes. It performs a function of the State. Its authority to exercise the right of eminent domain and to charge tolls was given primarily for the benefit of the public. It is, under governmental control though such control must be exercised with due regard to the constitutional guarantees for the protection of its property. *Olcott* v. *The Supervisors*, 16 Wall. 678, 694; *Sinking Fund cases*, 99 U. S. 700, 719; *Cherokee Nation* v. *Southern Kansas Railway*, 135 U. S. 641, 657. It cannot, therefore, be admitted that a railroad corporation maintaining a highway under the authority of the State may fix its rates with a view solely to its own interests, and ignore the rights of the public. But the rights of the public would be ignored if rates for the transportation of persons or property on a railroad are exacted without reference to the fair value of the property used for the public or the fair value of the services rendered, but in order simply that the corporation may meet operating expenses, pay the interest on its obligations, and declare a dividend to stockholders.

If a railroad corporation has bonded its property for an amount that exceeds its fair value, or if its capitalization is largely fictitious, it may not impose upon the public the burden of such increased rates as may be required for the purpose of realizing profits upon such excessive valuation or fictitious capitalization; and the apparent value of the property and franchises used by the corporation, as represented by its

stocks, bonds and obligations, is not alone to be considered when determining the rates that may be reasonably charged. What was said in *Covington & Lexington Turnpike Road Co.* v. *Sandford,* 164 U. S. 578, 596–7, is pertinent to the question under consideration. It was there observed: "It cannot be said that a corporation is entitled, as of right, and without reference to the interests of the public, to realize a given per cent upon its capital stock. When the question arises whether the legislature has exceeded its constitutional power in prescribing rates to be charged by a corporation controlling a public highway, stockholders are not the only persons whose rights or interests are to be considered. The rights of the public are not to be ignored. It is alleged here that the rates prescribed are unreasonable and unjust to the company and its stockholders. But that involves an inquiry as to what is reasonable and just for the public. . . . The public cannot properly be subjected to unreasonable rates in order simply that stockholders may earn dividends. The legislature has the authority, in every case, where its power has not been restrained by contract, to proceed upon the ground that the public may not rightfully be required to submit to unreasonable exactions for the use of a public highway established and maintained under legislative authority. If a corporation cannot maintain such a highway and earn dividends for stockholders, it is a misfortune for it and them which the Constitution does not require to be remedied by imposing unjust burdens upon the public. So that the right of the public to use the defendant's turnpike upon payment of such tolls as in view of the nature and value of the services rendered by the company are reasonable, is an element in the general inquiry whether the rates established by law are unjust and unreasonable."

A corporation maintaining a public highway, although it owns the property it employs for accomplishing public objects, must be held to have accepted its rights, privileges and franchises subject to the condition that the government creating it, or the government within whose limits it conducts its business, may by legislation protect the people against unreason-

able charges for the services rendered by it. It cannot be assumed that any railroad corporation, accepting franchises, rights and privileges at the hands of the public, ever supposed that it acquired, or that it was intended to grant to it, the power to construct and maintain a public highway simply for its benefit, without regard to the rights of the public. But it is equally true that the corporation performing such public ser- vices and the people financially interested in its business and affairs have rights that may not be invaded by legislative enactment in disregard of the fundamental guarantees for the protection of property. The corporation may not be required to use its property for the benefit of the public without receiving just compensation for the services rendered by it. How such compensation may be ascertained, and what are the necessary elements in such an inquiry, will always be an embarrassing question. As said in the case last cited : " Each case must depend upon its special facts; and when a court, without assuming itself to prescribe rates, is required to determine whether the rates prescribed by the legislature for a corporation controlling a public highway are, as an entirety, so unjust as to destroy the value of its property for all the pur- poses for which it was acquired, its duty is to take into con- sideration the interests both of the public and of the owner of the property, together with all other circumstances that are fairly to be considered in determining whether the legislature has, under the guise of regulating rates, exceeded its constitu- tional authority, and practically deprived the owner of prop- erty without due process of law. . . . The utmost that any corporation operating a public highway can rightfully de- mand at the hands of the legislature, when exerting its general powers, is that it receive what, under all the circumstances, is such compensation for the use of its property as will be just both to it and to the public."

We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the

original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth. But even upon this basis, and determining the probable effect of the act of 1893 by ascertaining what could have been its effect if it had been in operation during the three years immediately preceding its passage, we perceive no ground on the record for reversing the decree of the Circuit Court. On the contrary, we are of opinion that as to most of the companies in question there would have been, under such rates as were established by the act of 1893, an actual loss in each of the years ending June 30, 1891, 1892 and 1893; and that, in the exceptional cases above stated, when two of the companies would have earned something above operating expenses, in particular years, the receipts or gains, above operating expenses, would have been too small to affect the general conclusion that the act, if enforced, would have deprived each of the railroad companies involved in these suits of the just compensation secured to them by the Constitution. Under the evidence there is no ground for saying that the operating expenses of any of the companies were greater than necessary.

In concluding this opinion, it may not be inappropriate to say that the conclusions reached by us as to the effect of the Nebraska statute find some support in the report of the Board of Secretaries of the Nebraska Board of Transportation made in September, 1891, to the Board itself, and signed by Mr. Du-

worth and his colleagues. That report was made pursuant to
a resolution of the Board requiring the Secretaries to prepare
a statement of facts in reference to the rates of transportation
in Nebraska. It contains a brief history of what it charac-
terizes as "the controversy on the question of freight rates be-
tween the people and the railroads of the State," and embodies
such facts, figures and arguments as the Secretaries gathered
from both sides. The report says: "The present controversy
between the people and the railroads of this State originally
grew out of the question, not of rates or reduction of rates,
but of control. The people, recognizing the railroads as com-
mon carriers, not entitled under the state constitution to the
same broad liberty of action in business that the individual
citizen has, wanted to control the roads. The roads, impatient
of interference, wanted to control themselves and manage their
business in their own way." It further states: "We have
given you in the foregoing a brief history of the rate matter
as we have found it, and from that history and from the evi-
dence and reports on file in our office we beg leave to submit in
conclusion the following findings of fact: First. We find from
the evidence and sworn statements and reports, on file in our
office, and from personal inspection, that the railroads in this
State could not be duplicated for a less sum than $30,000 per
mile, taking into consideration their equipments and depot
and terminal facilities." Here follow a mass of figures and
calculations, and the report concludes: "We further find that
the railroads are not in a condition to stand, nor do their
earnings, figured on a basis cost of $30,000 per mile and not
what they claim they cost, justify any cut in local rates of
this State at the present time; and further, that a reduction
in the local rates in this State would increase the through
rates to market for our grain and would be a blow at the in-
dustry of the State. This last finding is fully established by
the fact that the Board of Transportation reduced the local
rates on hard coal 60 per cent, and yet the price to the con-
sumer was not lowered nor the price at the mines raised, which
shows conclusively that the through rates must have been
raised. In submitting this report we have presented the facts

and figures as we find them from evidence obtainable, from sworn reports now on file in our office. And we would respectfully recommend that no action be taken that will in any way jeopardize the interests of the producers of Nebraska, but that all interests be protected in the fullest manner possible, as provided by the foregoing findings."

To this report of the Secretaries is appended the " Findings of the Board," from which we make this extract : " After a careful and quite thorough investigation of the question of freight rates in Nebraska, which has occupied much time, and has taken a wide range, the state Board of Transportation has arrived at the conclusion that the rates now in force in this State cannot be generally reduced without doing violence to the business interests of the State, and at the same time injuring the shipping and producing classes. We have come to this conclusion, not by taking the cost of construction and equipments, nor the amount of stock and bonds issued per mile, but by making our computations upon the basis of what it would cost to duplicate the property at the present time. It has been our endeavor to deal fairly and justly with the question, and in arriving at a conclusion we have been governed only by the evidence, statements and facts produced for our consideration. A candid examination and comparison of the figures presented to us in the unanimous report of the Board of Secretaries, in the opinion of this Board, fully justifies the conclusion reached : That a general reduction of rates, as now in force over the State, is not practical at this time."

So that we have the judgment of the state Board of Transportation, as constituted in 1891, that a general reduction of rates could not then have been made without injury to the business of the State, to say nothing of the interests of those whose means were invested in railroad property. We are unable to find from the record before us that the situation in Nebraska had so changed in 1893 as to justify that being done in that year which it was not safe or just to do in 1891.

But it may be added that the conditions of business, so far as railroad corporations are concerned, have probably changed

for the better since the decree below, and that the rates pre-
scribed by the statute of 1893 may now afford all the com-
pensation to which the railroad companies in Nebraska are
entitled as between them and the public.   In anticipation,
perhaps, of such a change of circumstances, and the excep-
tional character of the litigation, the Circuit Court wisely
provided in its final decree that the defendants, members of
the Board of Transportation, might, " when the circumstances
have changed so that the rates fixed in the said act of 1893
shall yield to the said companies reasonable compensation for
the services aforesaid," apply to the court, by bill or otherwise
as they might be advised, for a further order in that behalf.
Of this provision of the final decree the state Board of Trans-
portation, if so advised, can avail itself.   In that event, if the
Circuit Court finds that the present condition of business is
such as to admit of the application of the statute to the rail-
road companies in question without depriving them of just
compensation, it will be its duty to discharge the injunction
heretofore granted, and to make whatever order is necessary
to remove any obstruction placed by the decrees in these cases
in the way of the enforcement of the statute.

Perceiving no error on the record in the light of the facts
presented to the Circuit Court,

*The decree in each case must be affirmed.*

The CHIEF JUSTICE took no part in the consideration or
decision of these cases.

MR. JUSTICE McKENNA was not a member of the court
when they were argued and submitted, and took no part
in their decision.